(298 P.3d 371)
No. 107,035

CAROL S. MESSNER, *Appellee*, v. CONTINENTAL PLASTIC
CONTAINERS and AMERICAN HOME ASSURANCE, *Appellants*.

Opinion filed March 29, 2013.

*John B. Rathmel*, of Rathmel & Belden, L.L.C., of Merriam, for appellants.

*William L. Phalen* and *Crystal D. Marietta*, of Pittsburg, for appellee.

Before McANANY, P.J., BUSER and STANDRIDGE, JJ.

McANANY, J.: Continental Plastic Containers and its insurance carrier, American Home Assurance Company, appeal the decision of the Workers Compensation Board awarding claims to Carol Messner in two separate workers compensation cases.

In Messner's first claim, Docket No. 253,153, Messner sought compensation for injuries she sustained as a result of a fall which occurred on July 18, 1999. Messner claimed that her disability increased from a functional impairment to a work disability when she left her employment with Continental. Thus, she sought an award of functional disability followed by an award of general disability, or work disability.

In her second claim, Docket No. 261,143, Messner alleged that she received additional injuries to her right shoulder from repetitive job duties she performed for Continental after returning to work following her fall.

On October 21, 2011, the Board determined that both of Messner's alleged injuries were work related and awarded compensation for both claims.

Continental raises three issues. First, Continental challenges the award of work disability in Docket No. 253,153, asserting that K.S.A. 44-510e(a) prohibits an award of work disability because Messner's award for functional disability would have been paid in full before she became eligible for work disability upon leaving her employment. Continental relies on the language in K.S.A. 44-510e(a) that states: "The resulting award shall be paid for the number of disability weeks at the full payment rate until fully paid or modified." We disagree with Continental's analysis. The Board found that Messner showed an increase in disability during the 415-week benefit period provided for in K.S.A. 44-510e(a). Thus, the Board had the authority to enter a lump-sum award that provided benefits for Messner's functional disability as well as her later work disability, both of which occurred as a result of her work related injury.

The remaining two issues relate to the Board's award in Docket No. 261,143. First, Continental appeals the Board's finding that Messner's shoulder injury arose out of and in the course of her employment. Our examination of the record discloses substantial evidence to support this finding by the Board. Next, Continental claims the Board erred in awarding Messner temporary total disability (TTD) compensation from April 26, 2001, to December 13, 2002, because Messner's list of work restrictions was not from an authorized treating physician. We agree with this contention. Messner's work restrictions that led to her leaving her employment were imposed by her personal chiropractor, not by an authorized treating physician. No authorized treating physician found that Messner experienced temporary total disability during the relevant time period as required by K.S.A. 44-510c(b)(2).

*Factual and Procedural Background*

The protracted factual and procedural history of this case extends from July 1999 to November 2011. We will provide a full narrative of the relevant events.

On July 18, 1999, Messner was working for Continental, a manufacturer of plastic bottles, as a factory line inspector when she tripped and fell. She landed on her left leg and hip, and her left

arm jammed into her ribs. She felt her neck snap and was in immediate pain. She attempted to finish her shift, but she left work before her shift was over.

Messner notified Continental of her injury, and she was sent to the Shawnee Mission Urgent Care facility where she was diagnosed as having sustained contusions to her left arm, elbow, wrist, knee, and ankle. Messner's pain persisted, and she was provided additional medical treatment and physical therapy. In addition to her work-related injuries, an MRI revealed that Messner had a pre-existing degenerative disc disease.

On January 27, 2000, Continental sent Messner to Dr. Ira Fishman, who examined Messner and found "mild residuals of cervical, thoracic, and lumbar strains, as well as contusions to her left upper and lower extremities." Dr. Fishman referred Messner for a functional capacity evaluation (FCE) to determine whether she could meet the physical demands of her employment. After receiving the results of the evaluation, Dr. Fishman gave a recommendation for Messner

"to return to work in the light physical demand category, with a maximum lifting of 15 pounds on an occasional basis, as well as performance of positional activities on an occasional basis, and standing and walking on a frequent basis. However, it was noted in the summary of this FCE that 'based on self-limiting behaviors, demonstrated performance should be considered the minimum she is capable of functioning [at] the present time.' . . . Messner did self-limit on positional activities due to reported complaints of mid, upper, and lower back pain and therefore because of this self-limiting behavior, the actual functional assessment was not a true reflection of her full capabilities."

Dr. Fishman opined that Messner had reached maximum medical improvement (MMI) and was not in need of further physical therapy treatments or medical intervention. Dr. Fishman believed that Messner's soft tissue injuries would resolve with time and that she had not sustained any permanent partial impairments as a result of her fall. Dr. Fishman concluded:

"In terms of Ms. Messner's return to work status, even with her identified self-limiting behavior on the [FCE], she is functioning quite close to her regular job duty physical demands. Since it has been identified on the FCE report that the results of this test may not be a true reflection of Ms. Messner's actual physical capabilities due to her self-limiting behavior, it is my opinion at this time that Ms.

Messner can return to her regular job duties without restrictions. It is my impression that Ms. Messner is capable of tolerating light duty work and I am, therefore, releasing her to her regular job duties without restrictions, effective on Monday (February 14, 2000)."

On February 16, 2000, Messner returned to work without restrictions to her previous position of line inspector. Messner had been off work from July 18, 1999, until February 16, 2000. The parties have stipulated that Messner was paid TTD benefits for the weeks she was off work for these injuries.

Messner continued to experience pain and various other symptoms from her injury. She testified that she did not feel that she was physically ready to go back to work because "I just was still hurting too much and I just couldn't do it." She claimed she was unable to do her job because of pain "from my shoulders and my neck and down through my right shoulder and my upper back, then right on down into my hip area, and then I still had the problems with the left thigh and down into the left knee." She claimed she was unable to do "the pulling or the pushing and the squatting and bending" required of a line inspector. She said she was unable to work full days and took vacation time or "would go home with points." Messner described her position as a line inspector as the lightest job available to her at Continental.

During her first week back to work, Messner's attorney referred her to Dr. Edward Prostic for an evaluation. Dr. Prostic examined Messner on February 18, 2000, and found that she was suffering from "chronic sprains and strain superimposed upon preexisting degenerative disc disease in the low back." Dr. Prostic recommended additional medical treatment and job restrictions, stating that Messner should avoid lifting more than "25 pounds occasionally, 10 pounds frequently, or 5 pounds constantly." Dr. Prostic also stated that Messner should avoid frequent bending or twisting at the waist, forceful pushing or pulling, use of vibrating equipment, and working in a captive position. He found Messner's permanent partial impairment rating to be 15% to the body as a whole on a functional basis. Messner did not mention complaints about her right shoulder to Dr. Prostic at this time.

In March 2000, Messner filed her first workers compensation claim, Docket No. 253,153. She alleged that the July 18, 1999, fall caused various work-related injuries.

After Messner reported the worsening of her physical condition to Continental, the administrative law judge (ALJ) sent Messner to Dr. Scott Luallin for an examination, which took place on August 28, 2000. Dr. Luallin noted in his report that his evaluation was to include an impairment rating and appropriate work restrictions. Dr. Luallin suggested certain work restrictions, such as limitations on lifting, using good lifting techniques, and avoiding forceful pushing or pulling. Dr. Luallin found Messner's functional impairment rating to be 10% to the body as a whole.

In November 2000, Messner filed a second workers compensation claim, Docket No. 261,143, alleging aggravation of her condition each and every working day from August 29, 2000, the day after she was evaluated by Dr. Luallin.

Messner had a follow-up visit with Dr. Prostic on February 12, 2001. Messner continued to complain of pain in her neck and back. She had also developed right carpal tunnel syndrome and right rotator cuff tendinitis. Dr. Prostic stated that the rotator cuff tendinitis and the right carpal tunnel syndrome were caused or contributed to by the work Messner performed for Continental each day beginning on August 29, 2000. Dr. Prostic concluded that Messner was suffering from a 20% impairment to the body as a whole, 15% from injuries resulting from the first accident, and an additional 5% for injuries to her upper right shoulder.

Messner claimed that her condition continued to deteriorate. She testified that her right shoulder would pop and a pain would shoot down her arm, sometimes causing her to lose control over her right hand. She continued working until April 25, 2001, when she delivered a note from her personal chiropractor with a list of work restrictions that Continental was unable to accommodate.

Beginning on September 10, 2001, Messner was examined and treated by Dr. Terrence Pratt, a board certified physical medicine and rehabilitation specialist. Messner came to court several times in an attempt to obtain authorization for medical treatment by Dr. Pratt. Dr. Pratt's notes from his initial examination identify the July

1999 fall as Messner's only work-related injury; however, Messner mentioned to Dr. Pratt that she was experiencing symptoms in her right shoulder and into her right extremity. After treatment was approved, Messner returned to Dr. Pratt for water therapy.

On December 13, 2002, Dr. Pratt concluded that Messner had reached MMI and should be released from his care. Dr. Pratt testified that he believed that Messner should be able to return to work in the sedentary or light physical demand levels of work.

Dr. Pratt last examined Messner on August 11, 2003, when he was asked to assess Messner for restrictions. Dr. Pratt believed that Messner was able to return to some form of substantial gainful employment in the open labor market if she was limited to sedentary and light physical work. Dr. Pratt did not link Messner's right upper extremity complaints to her July 18, 1999, accident, but he did not have any new claims of injury in the history given to him. On cross-examination, Dr. Pratt affirmed that he was not requested to address causation in his evaluation of Messner.

On November 10, 2003, Dr. Prostic found that Messner continued to have evidence of strain and sprain to her neck and back, trochanteric bursitis, rotator cuff disease of the right shoulder, and right carpal tunnel syndrome. Dr. Prostic increased his rating of Messner's impairment to the body as a whole to 24%. Of that 24%, Dr. Prostic attributed 15% impairment for the neck and back and 9% impairment to the whole body for the right upper extremity. Dr. Prostic reported that the cause of Messner's rotator cuff tendinitis was the repetitious lifting, pushing, and pulling that she performed during the final stage of her employment with Continental.

Dr. Craig Satterlee, a shoulder specialist, performed surgery to Messner's right shoulder on August 14, 2007, to repair the right rotator cuff. Dr. Satterlee found a 14% impairment to the right shoulder as a result of his surgical repair. Messner was released with restrictions on July 14, 2008. Dr. Satterlee found Messner to be at MMI on September 16, 2008.

Dr. Prostic reexamined Messner on July 21, 2008. He found that Messner continued to have chronic sprains and strains of her neck and back. After undergoing shoulder surgery, Messner continued

to have right carpal tunnel syndrome. Dr. Prostic determined that Messner's permanent partial impairment was 15% to the body as a whole for the spine and 20% for the upper right extremity. He opined that the injury to Messner's shoulder was work-related but was not the result of her July 1999 fall.

In his deposition in 2010, Dr. Prostic testified that the combined value of his impairment ratings for Messner's injuries from her fall on July 18, 1999, was 19% to the body as a whole based on the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (4th ed. 1995). He stated that Messner had sustained a 75% loss of task performing ability and was permanently and totally disabled from performing substantial gainful employment and is "realistically unable to return to gainful employment in the open labor market."

Continental hired Dr. Chris Fevurly, a physician with a specialty in occupational medicine, to examine Messner on April 3, 2009. Dr. Fevurly found that Messner's right shoulder complaints were not related to her work with Continental because they developed in 2003, 2 years after she left active employment with Continental. Dr. Fevurly believed Messner's right shoulder condition was the result of the degenerative process and the thinning of the rotator cuff that is commonly seen in people of a similar age. Dr. Fevurly agreed with Dr. Satterlee's assessment of a 14% impairment to the right shoulder but did not find it to be a work-related injury.

The ALJ ordered an independent medical examination with Dr. Thomas Shriwise. Dr. Shriwise opined that "half of [Messner's] shoulder impairment is from her ongoing work activities when she was sent back to work and half would be secondary to rotator cuff disease from her aging process."

In 2009, the decision was made that Messner would not return to work. Messner testified that her physical condition rendered her unable to engage in any type of employment.

Both of Messner's claims were consolidated for a hearing and the award. A regular hearing was held on July 9, 2010, and the ALJ issued an award of compensation on May 26, 2011:

- In Docket No. 253,153, for injuries sustained as a result of Messner's fall on July 18, 1999, the ALJ found that Messner

was entitled to 31 weeks of temporary total disability (TTD) compensation, followed by 47.88 weeks of permanent partial disability (PPD) compensation for a 12% functional impairment. Finally, the ALJ awarded PPD compensation not to exceed $100,000 for a 78.75% work disability after April 25, 2001, which was Messner's last day of work at Continental.

- In Docket No. 261,143, the ALJ found that Messner "sustained her burden as more probably true [than] not that she sustained an injury to her right shoulder" during the time period of August 29, 2000, to her last day worked, April 25, 2001. The ALJ awarded 127.43 weeks of TTD compensation followed by 15.61 weeks of PPD compensation for a 16% loss of use of the shoulder.

On May 27, 2011, Continental appealed to the Board, claiming the ALJ erred in its award in both cases. On October 21, 2011, the Board generally affirmed the ALJ's findings, with various housekeeping corrections to the calculations of the awards. The Board modified the awards to correctly reflect the proper average weekly wage, date of accident, maximum weekly benefit level, appropriate weeks of TTD, and the correct mileage reimbursement. It noted the ALJ's findings were "affirmed in all other regards."

In Docket No. 253,153, the Board found that Messner sustained a 12% functional impairment to the body as a whole while still employed and a 78.75% permanent partial general work disability once her employment ended. Messner was also awarded 29.57 weeks of TTD benefits from the date of injury (July 18, 1999) until the date she returned to work. The Board stated:

"With a date of accident of July 18, 1999, and a last day worked of April 25, 2001, the 12 percent functional impairment will fully pay out prior to claimant's last day worked. Therefore, the functional impairment will be paid at the reduced rate of $354.82. As claimant's permanent partial general (work) disability award of 78.75 percent will not begin until after claimant last worked for respondent, any [amount] due and owing or which comes due in the future will be paid at the stipulated maximum rate of $383.00 per week."

The Board concluded:

"Claimant is entitled to 29.57 weeks of temporary total disability compensation at the rate of $354.82 per week or $10,492.03, followed by 48.05 weeks at the rate of $354.82 per week or $17,049.10, for a 12 percent permanent partial whole person functional disability, followed by 188.31 weeks permanent partial general disability at the weekly rate of $383.00 per week in the amount of $72,122.73, for a 78.75 percent permanent partial general disability making a total award not to exceed $100,000.00.

"As of the date of this Award, the entire amount would be due and owing and ordered paid in one lump sum, minus any amounts previously paid."

In Docket No. 261,143, the Board affirmed the ALJ's determination that Messner suffered injury to her right shoulder each day from August 29, 2000, through her last day worked on April 25, 2001. TTD benefits were awarded from April 26, 2001, through December 13, 2002. Messner was awarded a 16% permanent partial functional disability at the level of the shoulder. The Board concluded:

"Claimant is entitled to 127.43 weeks of temporary total disability compensation at the rate of $401.00 per week or $51,099.43, followed by 15.61 weeks at the rate of $401.00 per week or $6,259.61, for a 16 percent permanent partial functional disability at the level of the shoulder, making a total award of $57,359.04."

Continental initiated this appeal on November 18, 2011.

*Work Disability Benefits*

We are first asked to interpret whether K.S.A. 44-510e(a) prohibits an award of PPD benefits when an employee's functional impairment benefits would have been fully paid before the event triggering a work disability.

There is no dispute that Messner suffered a work-related injury on July 18, 1999. As a result, the Board found that Messner was entitled to receive TTD benefits followed by PPD benefits through approximately mid-January 2001. On April 25, 2001, Messner left her work with Continental. The Board rejected the claim that Messner was permanently and totally disabled as a result of her injuries. She was not found by Dr. Prostic to be totally disabled until 2010, long after she had left the labor market. However, the Board did find that Messner was entitled to work disability benefits under

K.S.A. 44-510e(a) beginning in April 2001 when she left Continental's employment. The Board stated:

"Here, K.S.A. 44-510e is clear and unambiguous. Once claimant is no longer receiving compensation for wages equal to 90 percent or more of her average gross weekly wage from the date of injury, she becomes entitled to compensation for work disability. As of April 25, 2001, claimant was no longer employed, under the statute, she has suffered a 100 percent wage loss."

Continental does not contend that Messner did not have an ongoing disability. Rather, it contends that the Board incorrectly applied K.S.A. 44-510e(a) in awarding work disability benefits from the date Messner left her employment. Continental relies on the provision in the statute that directs that an award for permanent partial general disability shall be paid for the calculated number of disability weeks at the full payment rate *"until fully paid or modified."* (Emphasis added.) See K.S.A. 44-510e(a). Continental argues that the award for PPD was fully paid and never modified. Thus,

"the full payout would have occurred during the second week of January, 2001. Claimant continued to work, presumably at full pay and without workers compensation benefits, until her stipulated last day of work on April 25, 2001, approximately three months following the full payment of her permanent partial disability award.

"The statute makes no provision for events occurring subsequent to the full payment of an award."

Continental raises an issue of first impression. Our appellate courts have not yet determined the limitation denoted by the specific language of K.S.A. 44-510e(a)—"until fully paid or modified."

Under K.S.A. 2012 Supp. 44-556(a), final orders of the Workers Compensation Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601, *et seq.*, as amended. *Redd v. Kansas Truck Center*, 291 Kan. 176, Syl. ¶ 1, 239 P.3d 66 (2010). We have unlimited review of questions involving the interpretation or construction of a statute, owing "no significant deference" to the Board's interpretation or construction. See *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 457, 228 P.3d 403 (2010). The most fundamental rule of statutory construction is that the intent of the legislature controls if that intent can

be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). But

"[w]hen a workers compensation statute is plain and unambiguous, the courts must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily found in it. If the statutory language is clear, there is no need to resort to statutory construction." 289 Kan. 605, Syl. ¶ 1.

In our review of a statute we give the words of the statute their natural and ordinary meaning. *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 822, 104 P.3d 378 (2005).

Continental asserts that once Messner would have been paid her full functional impairment benefits arising from her injuries from the July 1999 accident, she no longer qualified for additional benefits even if her impairment increased. Continental does not appeal the disability calculation. Instead, Continental's sole challenge to the award rests on its assertion that the Board failed to apply the plain language of K.S.A. 44-510e(a) in awarding compensation for a general work PPD.

In considering Continental's argument, we are mindful of the protracted nature of these proceedings.

- Messner was injured in July 1999.
- She returned to work at her old job in February 2000 but had problems doing the work, though she had the lightest available job.
- She filed this claim in March 2000.
- She left work in April 2001.
- The regular hearing on her award was not held until July 2010.
- The ALJ's made an award in May 2011.
- The Board entered its order awarding compensation benefits in October 2011.

The Board's award was a lump sum award. Continental paid TTD benefits for the period when Messner was initially off work. There is no indication in the record that prior to the Board's award in October 2011 Messner received any PPD benefits for her injuries.

When an injured worker receives benefits for a work-related injury not listed on the K.S.A. 44-510d schedule, the Act provides for an award of PPD. A PPD award may be calculated in two ways: (1) based on an overall functional impairment calculated according to the AMA Guides to the Evaluation of Permanent Impairment; or (2) based on a statutorily defined work disability. See K.S.A. 44-510e(a). This case involves an award based on both calculations: a functional disability for one period of time followed by an award of general work disability.

K.S.A. 44-510e(a), the statute in effect at the time of Messner's injury, provides that a claimant suffering an injury is entitled to TTD and PPD benefits for up to 415 weeks from the date of injury. See *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 528, 154 P.3d 494 (2007). K.S.A. 44-510e(a) sets forth the following formula for calculating the weekly benefits for PPD:

"The amount of weekly compensation for permanent partial general disability shall be determined as follows:

(1) Find the payment rate which shall be the lesser of (A) the amount determined by multiplying the average gross weekly wage of the worker prior to such injury by 66⅔% or (B) the maximum provided in K.S.A. 44-510c and amendments thereto;

(2) find the number of disability weeks payable by subtracting from 415 weeks the total number of weeks of temporary total disability compensation was paid, excluding the first 15 weeks of temporary total disability compensation that was paid, and multiplying the remainder by the percentage of permanent partial general disability as determined under this subsection (a); and

(3) multiply the number of disability weeks determined in paragraph (2) of this subsection (a) by the payment rate determined in paragraph (1) of this subsection (a).

*"The resulting award shall be paid for the number of disability weeks at the full payment rate until fully paid or modified. . . .* In any case of permanent partial disability under this section, the employee shall be paid compensation for not to exceed 415 weeks following the date of such injury, subject to review and modification as provided in K.S.A. 44-528 and amendments thereto." (Emphasis added.) K.S.A. 44-510e(a).

Claimants are not eligible to receive PPD in the form of work disability as long as the claimant is earning at least 90 percent of the preinjury wage. So long as the claimant's wage rate is at least 90 percent of the preinjury wage, the claimant receives compen-

sation based on an award of functional impairment. K.S.A. 44-510e(a). K.S.A. 44-510e(a) defines functional impairment as

"the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, if the impairment is contained therein."

The formula in K.S.A. 44-510e(a) was adopted in 1993. See L. 1993, ch. 286, § 34. Prior to the 1993 amendments to the Workers Compensation Act, injured workers were entitled to 415 weeks of PPD benefits, but the weekly benefit was 2/3 of his or her weekly wage multiplied by his or her disability rating. Thus, prior to 1993, the injured employee received less every week but for a longer period of time. See K.S.A. 1992 Supp. 44-510e(a).

Under the current formula provided in K.S.A. 44-510e(a) for calculating PPD benefits, an employee is entitled to receive a full ⅔ of his or her regular weekly wage—up to the statutory maximum—even if he or she continues to work. However, the length of time the employee receives benefits is determined by the amount of TTD benefits the employee received and the disability rating attributable to the injury. The higher the disability rating, the longer period the employee receives PPD benefits.

Here, the Board awarded Messner 29.57 weeks of TTD compensation at the rate of $354.82 per week, or $10,492.03, followed by 48.05 weeks at the rate of $354.82 per week, or $17,049.10, for a 12% permanent partial whole person functional disability, followed by 188.31 weeks of permanent partial general disability at the weekly rate of $383 per week in the amount of $72,122.73, for a 78.75% permanent partial general disability, for a total award somewhat less than the $100,000 cap.

The language of K.S.A. 44-510e(a) that Continental claims prohibits an award of general work disability in Messner's case appears immediately after the language providing for the calculation of the award of PPD. K.S.A. 44-510e(a) provides as follows:

"The resulting award shall be paid for the number of disability weeks at the full payment rate *until fully paid or modified.* If there is an award of permanent disability as a result of the compensable injury, there shall be a presumption that

disability existed immediately after such injury. In any case of permanent partial disability under this section, the employee shall be paid compensation for not to exceed 415 weeks following the date of such injury, subject to review and modification as provided in K.S.A. 44-528 and amendments thereto." (Emphasis added.)

As noted earlier, Continental asserts that at the conclusion of Messner's 48.05 weeks of functional PPD, and so long as the payment rate was not modified under K.S.A. 44-528, Messner's claim should have been considered to be fully paid. But the Board rejected this argument when, in awarding work disability, it acknowledged that "[w]ith an accident date of July 18, 1999, and a last day worked of April 25, 2001, the 12 percent functional impairment will fully pay out prior to claimant's last day worked." The Board found:

"K.S.A. 44-510e is clear and unambiguous. Once claimant is no longer receiving compensation for wages equal to 90 percent or more of her average gross weekly wage from the date of injury, she becomes entitled to compensation for work disability. As of April 25, 2001, claimant was no longer employed, under the statute, she has suffered a 100 percent wage loss."

In *Ponder-Coppage v. State*, 32 Kan. App. 2d 196, 83 P.3d 1239 (2002), this court held that if there is an increase or decrease in functional impairment or work disability during the 415 weeks, an award may be modified to reflect such a change in impairment. In *Ponder-Coppage*, the employer appealed the Board's award of work disability, which was awarded after the claimant filed for a modification of a prior award. After an injury in 1994, the claimant returned to work in 1996. The claimant received an award of PPD based on a 5% functional impairment rating. In 1997, claimant's pain increased, and she was given an accommodated position. Later that same year, she accepted a voluntary layoff due to the closing of the hospital where she worked. In 1998, she filed an application for review and modification under K.S.A. 44-528(d), asserting that her condition had worsened and requesting an award of work disability. The Board awarded PPD based on a 23% work disability. 32 Kan. App. 2d at 197. The employer disputed the award, arguing that the claimant could not be awarded compensation for a time period that occurred more than 6 months before

she filed her application for modification. See K.S.A. 44-528(d). The court held the claimant was entitled to receive full compensation for her work disability. 32 Kan. App. 2d at 198. In interpreting the language of the Act, this court stated:

"K.S.A. 44-510e(a) sets forth the number of weeks that compensation is received but limits that compensation to 415 weeks from the date of the work-related accident. Consequently, even if the effective date of a modified award is 6 months before the application was filed, the modified award only compensates for the remaining unpaid weeks, if any, that are proven but not yet expired. If an employer has paid the maximum amount, the modified award does not offer further payment." 32 Kan. App. 2d at 200.

Applying these principles to the present case, K.S.A. 44-510e(a) limits compensation to up to 415 weeks after the date of the accident. Here, there was not an award and a later application for modification. In fact, no award was entered until many years after Messner ended her employment at Continental, thereby commencing the period of her work disability. Nevertheless, the same 415-week limitation applies.

Messner was injured on July 18, 1999. She was off work for a time, thus resulting in an award of TTD benefits. After her return to work, Messner ultimately was awarded PPD benefits for 48.05 weeks for her functional disability. That period would have ended in mid-January 2001. Messner's condition worsened, and she left her employment in April 2001. After April 25, 2001, her last day worked, the Board later declared that Messner was entitled to compensation for a work disability under K.S.A. 44-510e(a). As in *Ponder-Coppage*, the limitation provided under the statute is a maximum of 415 weeks after the accident.

In *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 899 P.2d 516 (1995), this court examined the portion of K.S.A. 44-510e(a) which prohibits an award of work disability benefits as long as the claimant earns at least 90 percent of his or her preinjury wage. This provision was enacted to prevent an employee from "double-dipping" by collecting substantial postinjury wages while simultaneously collecting work disability. 21 Kan. App. 2d at 371. Lee was injured while working for Boeing. When he returned to work he could not complete his job tasks because of the excessive bending the job

required, so he was moved to a light duty job. Lee was paid a wage comparable to his preinjury wage during the time he held this light duty job. Ultimately, Lee was laid off for economic reasons. After the layoff, Lee found work paying $150 per week, which apparently was less than 90 percent of his prior wage at Boeing.

Under K.S.A. 44-510e(a), the claimant must overcome the presumption that he or she is not entitled to work disability. Here, the court rejected Boeing's argument that if Lee could not overcome the presumption of work disability for the period when he did light duty work at Boeing at his preinjury wage, then he could not overcome the presumption later when he was laid off from work and then earned less than 90 percent of his preinjury wage. The *Lee* court found that the statute protects the worker from an employer providing accommodating work to avoid liability for work disability benefits.

"The effect of Boeing's construction is this: A large, well-paying employer could return an employee to a light duty job at his or her pre-injury wage. After a period of time, the employer could discharge the injured employee in the midst of downsizing. In this way, the employer would save money by paying the injured worker an inflated salary in an accommodated job for a period of time, then discharging the worker and avoiding work disability benefit payments based on the presumption." 21 Kan. App. 2d at 372.

Thus, the *Lee* court concluded that if a claimant can meet the burden of proving a work disability, the claimant is not limited from doing so because the employee was first able to return to work at a comparable wage. "The presumption of no work disability set out in [K.S.A. 44-510e(a)] may be applied as to one period of time and overcome as to a later period; for example, after an accommodated worker is laid off." 21 Kan. App. 2d 365, Syl. ¶ 4.

Here, Messner testified that she never felt able to return to work and she often left work early due to her pain and discomfort. However, she attempted to perform her job from February 2000 through April 2001. For a period of 48.05 weeks after she returned to work, Messner was limited to benefits for a functional impairment. After she left work, Messner sustained a 100 percent wage loss. Messner's effort to continue her employment after her injury

did not bar her from collecting work disability after she was unable to continue working.

Continental's proposed interpretation of the statute provides for a situation in which an injured worker may not want to risk an award of work disability by attempting to return to work. Using Continental's construction of the "until fully paid or modified" language reduces an employee's incentive to return to work following a work disability. When reading the statute as a whole, K.S.A. 44-510e(a) provides for an award of compensation for a time period of 415 weeks after a work-related accident. An award for functional impairment may apply to one period of time, and an award of work disability may apply to a later period of time within the 415 weeks that a worker is eligible to be compensated. 21 Kan. App. 2d at 372.

Most of the cases with the factual scenario of a functional impairment followed by a work disability involve K.S.A. 44-528(a), which provides for a modification of an award in such a situation. See *Ponder-Coppage*, 32 Kan. App. 2d at 199; *Ramey v. Cessna Aircraft*, No. 104,819, 2011 WL 4035762 (Kan. App. 2011) (unpublished opinion) (claimant filed an application for modification to determine whether his disability had increased resulting in a modified award of PPD benefits); *Serratos v. Cessna Aircraft Co.*, No. 104,106, 2011 WL 2637449 (Kan. App. 2011) (unpublished opinion) (if claimant's condition is increased or decreased under K.S.A. 44-528, the extent or duration of a claimant's disability and the employer's liability are redetermined under K.S.A. 44-510e[a]); *Stinchcomb v. Raytheon Aircraft Co.*, No. 92,174, 2005 WL 1214246 (Kan. App. 2005) (unpublished opinion) (an award can be modified to compensate for any unpaid weeks remaining within the 415-week limitation).

The present case does not involve K.S.A. 44-528(a) because there was no award followed by an application for modification. Although Messner's accident occurred in 1999, the Board did not enter its award until October 2011, over a decade after Messner left her employment in April 2001.

K.S.A. 44-528(a) provides the agency with the ability to review and modify the extent or duration of a claimant's disability and the

employer's liability to accommodate a situation in which there is a change in disability. In this case, an award was not initially made then modified. But K.S.A. 44-510e(a) clearly contemplates a change in the award of compensation according to a claimant's increased or decreased level of impairment. When construing statutes to determine legislative intent, an appellate court must consider various provisions of an act *in pari materia* with a view to reconciling and harmonizing the provisions if possible. *Nistler v. Footlocker Retail, Inc.*, 40 Kan. App. 2d 831, 839, 196 P.3d 395 (2008). K.S.A. 44-510e(a) provides that "the resulting award shall be paid for the number of disability weeks at the full payment rate until fully paid or modified." See K.S.A. 44-510e(a). This language makes clear that an award can be modified within the 415-week limit, as is provided in K.S.A. 44-528(a). Here, Messner was awarded compensation for a functional impairment during the time that she returned to work; but her condition worsened and the Board awarded work disability benefits for the period after she was no longer able to work. Continental does not challenge the Board's finding that Messner's disability increased as the natural and probable consequence of the July 18, 1999, injury.

If, after an award is made, a claimant can obtain a modification of the award upon showing an increased level of disability, it naturally follows that the same can be accomplished in the first instance when the Board is considering for the first time all of the disabling consequences of a single job-related injury, provided that its award is confined to the 415-week limitation for benefits set forth in K.S.A. 44-510e(a).

Messner had not received any PPD benefits for her July 1999 injury by the time she quit work in 2001. The Board did not affirm the award of compensation until a decade later in 2011. At that time, the Board ordered "the entire amount would be due and owing and ordered paid in one lump sum, minus any amounts previously paid." The record does not indicate that Continental had paid any of, let alone "fully paid," the functional disability award before Messner left Continental. Thus, even if we accept Continental's interpretation of the "fully paid or modified" lan-

guage in K.S.A. 44-510e(a), Continental did not prove that it had "fully paid" Messner's PPD benefits.

The Board found that Messner showed an increase in disability during the 415-week limitation. We conclude that the Board had the authority to enter a lump-sum award that provided benefits for both Messner's functional disability and her work disability occurring as a result of her July 18, 1999, injury.

*Right Shoulder Injury*

We are asked to determine whether substantial competent evidence, when viewed in light of the record as a whole, supports the Board's finding that Messner sustained a second injury to her right shoulder beginning on August 29, 2000, and continuing every day through her last day worked on April 25, 2001.

We review a challenge to the Board's factual findings by examining the record as a whole to determine whether the findings are supported by substantial evidence. See K.S.A. 2012 Supp. 77-621(c)(7).

" '[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2012 Supp. 77-621(d).

Under this standard of review, we do not weigh conflicting evidence except to determine whether the evidence supporting the Board's decision has been so undermined by conflicting evidence that we no longer have confidence in the substantial nature of the evidence. *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009). Although not statutorily defined, "substantial evidence" refers to "evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis of fact

from which the issue raised could be easily resolved." *Redd*, 291 Kan. at 183-84.

The claimant has the burden to establish his or her right to an award of compensation under the Workers Compensation Act and to prove the various conditions on which his or her right depends. K.S.A. 2011 Supp. 44-501b(c); K.S.A. 2011 Supp. 44-508(h). "Once the claimant has met his or her burden of proving a right to compensation, the employer has the burden of proving relief from that liability through [a statutory defense or exception]." *Foos v. Terminix*, 277 Kan. 687, 693, 89 P.3d 546 (2004).

Continental complains that "the only evidence of work related aggravation of Claimant's right shoulder" comes from Messner's testimony at the preliminary and regular hearings and from her own medical expert, Dr. Prostic. Continental claims that every other source of information about the causation of Messner's right shoulder injury suggests that it was not connected to her work activities from August 2000 to April 2001. Continental contends that the ALJ and the Board erred by accepting the medical testimony of Dr. Prostic regarding causation and impairment ratings and by discounting the opinions of the "neutral" physicians without any explanation as to the reasoning behind their decisions to do so.

Essentially, Continental is asking this court to reweigh the evidence and assess the credibility of the testimony. As previously noted, we limit our review to determining whether the Board's decision has been so undermined by conflicting evidence that we no longer have confidence in the substantial nature of the evidence. *Herrera-Gallegos*, 42 Kan. App. 2d at 363.

With respect to the claim that the Board discounted without explanation the opinions of all the physicians except Dr. Prostic, we note that in its award the Board stated that "it is questionable whether either [Dr. Pratt or Dr. Vito Carabetta] had an accurate history regarding the timing of the onset of those right upper extremity problems." The ALJ made a similar observation. Our review of Messner's medical history indicates that the ALJ and the Board had reason to view some of the medical testimony with caution.

Messner testified that she was required to do repetitious pulling, lifting, and overhead reaching in the performance of her job duties. On August 28, 2000, the ALJ sent Messner to Dr. Luallin for an independent medical evaluation for rating and restriction purposes. At this time, Messner reported "right parascapular tightness."

From August 29, 2000, to April 25, 2001, Messner's condition worsened and she developed pain in her right shoulder. She often worked 12-hour days. In February 2001, Dr. Prostic's examination reported that Messner had developed evidence of right carpal tunnel syndrome and rotator cuff tendinitis of the right shoulder.

In March 2001, while Messner was still working for Continental, she filed a new workers compensation claim at Continental's request in order to obtain medical treatment for her right shoulder injury.

In May 2001, Messner visited Dr. Fishman, and the pain diagram indicated that she was having pain in her upper right extremity. In September 2001, Dr. Pratt's report showed that Messner complained of discomfort and problems with the range of motion in her right shoulder.

In 2004, the ALJ requested that Dr. Pratt provide an independent evaluation to determine Messner's restrictions. The ALJ asked Dr. Pratt not to provide an opinion regarding causation. In 2007, Messner eventually had surgery to repair the damage to her right shoulder.

Dr. Prostic testified that Messner's right shoulder injury was caused by her work at Continental. He testified that from August 29, 2000, through April 25, 2001, Messner sustained a series of traumas to her upper right extremity. Dr. Shriwise found that "half of her shoulder impairment is from her ongoing work activities when she was back to work and half would be secondary to rotator cuff disease from her aging process."

Both the ALJ and the Board found that Messner sustained injury to her right shoulder arising out of and in the course of her employment. We are persuaded that the record contains substantial competent evidence in support of the Board's factual determination that Messner's right shoulder injury arose out of her work activities from August 2000 to April 2001.

*Temporary Total Disability Benefits*

Continental claims the Board erred in awarding Messner TTD compensation for her right shoulder injury from April 25, 2001, Messner's last day of work and the date of injury, to December 13, 2002, when Dr. Pratt indicated that Messner had reached MMI.

This final argument involves the evaluation of the Board's factual findings. We review a challenge to the Board's factual findings in light of the record as a whole to determine whether they are supported by substantial evidence. See K.S.A. 2012 Supp. 77-621(c)(7). However, resolution of this issue also requires statutory interpretation over which we have unlimited review. See *Ft. Hays St. Univ.*, 290 Kan. at 457.

In April 2001, Messner visited her personal chiropractor, who imposed work restrictions. Messner communicated the chiropractor's work restrictions to Continental, but Continental would not accommodate these work restrictions so Messner did not return to work. Messner claims she was forced to leave her employment on April 25, 2001, due to a worsening of her condition and Continental's inability to accommodate her work restrictions.

TTD benefits should be awarded when the injured worker, on account of the injury, is rendered completely and temporarily incapable of engaging in any type of substantial and gainful employment. K.S.A. 44-510c(b)(2). This statute states:

"Temporary total disability exists when the employee, on account of the injury, has been rendered completely and temporarily incapable of engaging in any type of substantial and gainful employment. A release issued by a health care provider with temporary medical limitations for an employee may or may not be determinative of the employee's actual ability to be engaged in any type of substantial and gainful employment, *except that temporary total disability compensation shall not be awarded unless the opinion of the authorized treating health care provider is shown to be based on an assessment of the employee's actual job duties with the employer, with or without accommodation.*" (Emphasis added.) K.S.A. 44-510c(b)(2).

The Board found Messner to be temporarily and totally disabled from April 26, 2001, when she left Continental, through December 13, 2002, when Dr. Pratt found she had reached MMI. But there is no indication in the record that Dr. Pratt or any other authorized

treating health care provider found Messner to be incapable of engaging in substantial and gainful employment when she left Continental. Under K.S.A. 44-510c(b)(2), the mere fact that a physician has released the employee with restrictions does not establish whether the employee is capable of engaging in any type of employment.

Leading up to Messner's last day of work, she was first seen by Dr. Prostic in February 2000. He imposed work restrictions that Messner worked under for more than a year. He did not find any temporary total disability on account of Messner's shoulder condition. In fact, Messner did not mention her shoulder to Dr. Prostic at that time. Dr. Luallin agreed with Dr. Prostic when he examined Messner in August 2000. Dr. Prostic again saw Messner in February 2001, at which time she had right shoulder complaints. But Dr. Prostic did not find that she suffered TTD from that condition.

Messner quit work in April 2001 based on restrictions imposed by her personal chiropractor, not by an authorized treating physician. On direct examination at the regular hearing, Messner testified:

"Q. . . . Your last day that you physically worked at the facility was April 26 of 2001?
"A. Yes.
"Q. What happened at that time?
"A. That was when I had went to a doctor of my own and he put restrictions on me, and they wouldn't let me work with restrictions. *And he was not a workmen's comp doctor.*" (Emphasis added.)

Neither Dr. Fishman nor Dr. Pratt, the doctors who examined or treated Messner's shoulder between the time she quit work and the time she reached MMI, opined that Messner suffered a TTD. In fact, Dr. Pratt opined that at the time Messner reached MMI she should be able to return to work in a sedentary job or one that imposes only a light physical demand.

Under K.S.A. 44-510c(b)(2), an authorized treating physician needed to find Messner to be "completely and temporarily incapable of engaging in any type of substantial and gainful employment" in order for Messner to be eligible for TTD benefits. Messner has not met this burden. Thus, we reverse the award of TTD

compensation for Messner's right shoulder for the period from April 26, 2001, through December 13, 2002, and remand for the Board to recalculate Messner's award for her right shoulder injury in Docket No. 261,143.

Affirmed in part, reversed in part, and remanded with directions.