NOT DESIGNATED FOR PUBLICATION

No. 117,970

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LOREN E. JONES,
*Appellee*,

v.

U.S.D. No. 259,
*Appellant*.


MEMORANDUM OPINION


Appeal from Workers Compensation Board. Opinion filed May 4, 2018. Affirmed.


*Travis L. Cook*, *Vincent A. Burnett*, and *Dallas L. Rakestraw*, of McDonald Tinker PA, of Wichita, for appellant.


*Jan L. Fisher*, of McCullough, Wareheim & LaBunker, of Topeka, for appellee.


Before STANDRIDGE, P.J., HILL and BUSER, JJ.


PER CURIAM: This is an appeal by U.S.D. No. 259, a self-insured school district, from the holding of the Workers Compensation Board that the 2011 cervical spine injuries received by one of its janitors, Loren E. Jones, were the result of a workplace injury. The District questions the sufficiency of the evidence and doubts the credibility of the witnesses. Our review of the record reveals that substantial evidence supports the Board, and we are not persuaded by the District's credibility argument. A determination of credibility is for the Board, not an appellate court. We affirm the Board's finding on this point.

This is a companion appeal to *Jones v. U.S.D. No. 259*, ___ Kan. App. 2d ___, ___ P.3d ___ (No. 117,915, this day decided), where Jones appealed the Board's reduction of his task losses for a 2014 lower back injury. The workers compensation awards for his two injuries—one in 2011 and one in 2014—were entered separately but were decided in a common proceeding. We recognize that the parties are familiar with the facts and those relating to the injuries will not be repeated here because they are set out in our opinion in No. 117,915. In this case, however, we will delve into more of the medical testimony about Jones' cervical spine injury. But first we establish our legal framework.

*We must examine the entire record.*

Our review is governed by the Kansas Judicial Review Act, K.S.A. 77-601 et seq. The law limits our scope of review in K.S.A. 2017 Supp. 77-621. For questions of fact we may only overturn the Board's decision if the evidence is not substantial:

> "[T]he agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act." K.S.A. 2017 Supp. 77-621(c)(7).

The statute defines "in light of the record as a whole" to mean all relevant evidence that supports or detracts from a finding, with no reweighing of the evidence by us:

> "[T]he adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding

2

officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2017 Supp. 77-621(d).

Simply put, we review the agency's factual determination for substantial evidence. Substantial evidence is evidence that a reasonable person could find sufficient to support a conclusion. *Buchanan v. JM Staffing*, 52 Kan. App. 2d 943, 948, 379 P.3d 428 (2016). In making the determination of whether the evidence supports the Board's determination, we look at confirming as well as detracting evidence, the Board's credibility determinations, and explanations for its ruling. This does not allow us to reweigh the evidence or substitute our opinions on the evidence for the factual determinations of the agency. *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014). When looking at the supporting and conflicting evidence, we will uphold the determination of the trier of fact unless the detracting evidence wholly undermines the conclusion drawn by the Board to the extent that we lack confidence in the substantial nature of the supporting evidence. See *Messner v. Continental Plastic Containers*, 48 Kan. App. 2d 731, 750, 298 P.3d 371 (2013).

An employer's liability under the Act is determined based upon the law in effect at the time the injury occurred. *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015). Because Jones' injury occurred on February 14, 2011, the governing law is the statutes enacted prior to the massive 2011 amendments, which went into effect May 15, 2011. See generally L. 2011, ch. 55.

This means that the burden was on Jones to prove his claim:

"If in any employment to which the workers compensation act applies, personal injury by accident arising out of and in the course of employment is caused to an employee, the employer shall be liable to pay compensation to the employee in accordance with the

3

provisions of the workers compensation act. In proceedings under the workers compensation act, the burden of proof shall be on the claimant to establish the claimant's right to an award of compensation and to prove the various conditions on which the claimant's right depends." K.S.A. 2010 Supp. 44-501(a).

The parties stipulated that Jones was injured through a workplace accident on February 14, 2011. The stipulation also included that Jones had a bilateral shoulder injury that arose from that accident. The parties disagreed about the extent of the injuries caused by that accident and litigated whether Jones' cervical spine injury arose from the 2011 accident. Jones had the burden of proof to show that it was more probable than not that the cervical spine injury arose from his 2011 accident.

The question here boils down to whether sufficient evidence supports a finding that Jones met his burden of proof.

*We summarize the circumstances of the 2011 injury and treatment.*

After hurting himself carrying heavy boxes of copy paper upstairs, Jones reported his injury to the District, and the District referred Jones to Dr. John Babb. About 10 days later, Jones met with Dr. Babb and gave his medical history and described the symptoms he was experiencing. On a pain diagram chart, Jones stated that he was experiencing symptoms in both shoulders, both arms, and his right hand. At this time, Jones was most concerned with his shoulder pain, but stated that his arms, hands, and wrists had also been bothering him.

Dr. Babb gave Jones a corticosteroid injection in his shoulders and ordered physical therapy. About four months later, he released Jones to return to work without restrictions. Throughout the treatment, Jones denied feeling numbness or tingling in his arms. Although he was released to return to work, Jones was still experiencing some pain

4

in his shoulders and down both arms. Jones also claimed to have been experiencing pain in his neck and shoulders, which extended down both arms into his hands.

After being released, Jones returned to his job as a custodian at the school and performed all of the tasks required of him, even though he was experiencing some pain, tingling, and numbness in his hands, arms, and neck. During August 2012, Jones received a settlement offer for his workers compensation claim for his injuries. He did not settle the claim because he was still experiencing pain. Jones worked until August 27, 2012, when he went to his primary care physician, Dr. Steven Penner. Jones complained of pain in his neck and problems with his shoulders, arms, and fingers. Jones also complained of having a tingling feeling when he was being examined by Dr. Penner. Dr. Penner ordered an MRI, which showed spinal canal stenosis and a herniated disc in Jones' cervical spine. Dr. Penner referred Jones to Dr. Raymond Grundmeyer.

Jones told Dr. Grundmeyer that he was experiencing symptoms in his hands, shoulders, back, and neck. Based upon a physical examination and the MRI, Dr. Grundmeyer recommended immediate surgery on Jones' cervical spine. Dr. Grundmeyer performed the surgery on September 12, 2012. Jones had postoperative visits with Dr. Grundmeyer. After Jones had shown sufficient improvement, Dr. Grundmeyer determined that it was medically appropriate to allow Jones to return to work without any permanent restrictions. Jones returned to work at the school, making the same wage he was making before the 2011 injury. Jones continued to work in the same manner as he worked prior to this injury.

In May 2013, the District had Jones meet with Dr. Chris Fevurly. Dr. Fevurly did not believe that Jones' neck pain was caused by his 2011 injury. In contrast, Dr. Fevurly believed the cervical spine involvement began sometime after the 2011 injury. In Dr. Fevurly's opinion, Jones should have permanent work restrictions due to his shoulder

5

injuries. Dr. Fevurly stated that Jones should avoid repetitive or prolonged forceful overhead work.

After making a workers compensation claim, in April 2015, Dr. Pedro Murati, at Jones' request, reevaluated him. This examination concerned Jones' shoulder and neck pain. Dr. Murati opined that Jones had bilateral carpal tunnel syndrome due to double crush syndrome and either rotator cuff tears or shoulder sprains. He also noted the extent of Jones' neck surgery. Dr. Murati believed that at the very least, Jones' neck and shoulder injuries were an aggravation, acceleration, or intensification of a preexisting condition that was caused by Jones' work activities. Due to this, Dr. Murati determined that Jones had a 45 percent whole body functional impairment. Further, Dr. Murati would have assigned various permanent restrictions following the 2011 injury. The restrictions from the 2011 injury, in Dr. Murati's opinion, were still applicable at the time Jones was examined for the back injury.

The administrative law judge ordered Jones to have an independent medical evaluation performed by Dr. Terrence Pratt. This evaluation involved reviewing medical records in addition to interviewing and physically examining Jones. Following Dr. Pratt's initial evaluation, the parties requested the doctor to render an opinion on the causation of Jones' cervical spine injury. He determined that it was probable that Jones' disc abnormality was caused by Jones' 2011 workplace accident. Specifically, this determination was based on:

> "[Jones'] surgical specialist noted symptoms in relationship to the vocationally related event. MRI reveals a significant disk abnormality as well as degenerative changes. The degenerative changes identified were preexisting and unrelated to the event. The disk resulted in spinal stenosis and upper extremity symptoms more acutely. The acute findings were related to his vocationally related activities, resulting in the need for the procedure. He has preexisting involvement as well as vocationally related involvement. The vocationally related activities with his reports of heavy lifting would be responsible

6

for aggravation of the underlying involvement as well as probable in relationship to the disk abnormality resulting in the need for the procedure."

Dr. Pratt noted that cervical disc abnormalities can be symptomatic into the shoulders and arms. He determined the pain diagram that Jones filled out when he visited Dr. Babb was consistent with someone that had a cervical spine injury. Thus, in Dr. Pratt's opinion, symptoms of the cervical spine injury were present within days of the 2011 injury. Additionally, the determination regarding causation was not based solely on Jones' statements; rather, it was based upon all of the information available, including the cervical spine MRI and pain diagram from the 2011 injury.

Further, Dr. Pratt determined that Jones had a 25 percent whole body functional impairment due to his neck injury. Dr. Pratt also assigned a six percent functional impairment to each of Jones' shoulders due to the 2011 injury. Thus, Dr. Pratt ultimately assigned a 31 percent whole body permanent partial impairment, which in his opinion was caused by the 2011 injury. Dr. Pratt believed it was not appropriate to release Jones without permanent restrictions for this injury. He would have limited Jones by prohibiting him from lifting more than 30 pounds, pushing or pulling more than 40 pounds, and doing overhead activities.

In due course, the ALJ determined that Jones' neck and shoulder injuries were caused by Jones' 2011 workplace injury. The ALJ adopted Dr. Pratt's testimony in reaching this finding. Specifically, the ALJ relied upon Dr. Pratt's finding that Jones had displayed symptoms of cervical spine involvement shortly after the 2011 accident due to the complaints of symptoms in his shoulders and arms. The ALJ also found that Dr. Pratt's conclusion regarding causation of the cervical spine injury was corroborated by the testimony of both Drs. Grundmeyer and Murati.

For the 2011 injury, the ALJ found that Jones had a 31 percent permanent partial impairment to the whole body. Additionally, the ALJ determined that there was no task loss for this injury. This impairment entitled Jones to an award of $69,810.64. Further, due to the 2014 accident, Jones had also sustained a 100 percent wage loss that resulted in a 50 percent disability. This disability entitled Jones to an additional award up to $100,000.

In its review of the matter, the Board found that the ALJ did not err in its findings on the causation of the 2011 injury. Without offering further explanation, the Board stated it "agrees with the judge's detailed analysis on these issues."

*We offer our observations of the record.*

Realistically, there is evidence in this record that could support a finding that Jones' cervical spine injury was caused or not caused by his work activities. Different doctors had different opinions about the extent of Jones' injury. While Drs. Babb and Fevurly did not believe that Jones' cervical spine injury arose from his workplace accident, Drs. Murati, Grundmeyer, and Pratt all believed the cervical spine injury was causally related to the workplace accident.

Considering and weighing such conflicting evidence is the function reserved by law for both the ALJ and the Board. It is not the duty of this court. This is not a de novo proceeding. While there is conflicting evidence here, it does not rise to the level that we can hold the ALJ lacked substantial evidence to support the conclusion. Essentially, the District is asking us to adopt the position taken by the two doctors they presented. In other words, the District wants this court to impermissibly reweigh the evidence.

The District's argument is mainly based upon Jones' delay in seeking treatment for a cervical spine injury. In the District's view, this delay, when considered with the

8

testimony of Drs. Babb and Fevurly, shows that the cervical spine injury was not related to Jones' 2011 work accident. After all, according to Dr. Babb, Jones did not report feeling numbness or tingling during the treatment following the injury. Therefore, according to the District, this demonstrates that the symptoms of the cervical spine injury did not begin until sometime after Jones was released from treatment and before he sought treatment with Dr. Penner in 2012. The District argues that this shows the weight of the evidence supports a conclusion that the cervical spine injury did not arise from Jones' 2011 workplace accident. In making this conclusion, the District invites us to ignore Dr. Pratt's evidence on this issue.

The District paints Dr. Pratt's testimony as flawed because it relied heavily on Jones' subjective medical history. Further, Jones' subjective medical history is contradicted by the treatment history according to Dr. Babb.

Actually, the District's argument does not accurately portray Dr. Pratt's testimony. Dr. Pratt did not base his determination solely on Jones' subjective medical history. He reviewed Jones' medical history, the subjective history that Jones provided during the examination, the results of a physical examination, the cervical spine MRI, and the reports of the doctors that had previously examined Jones. Based on all of this information, Dr. Pratt believed that Jones was experiencing symptoms that showed cervical spine involvement days after the workplace accident.

Experiencing symptoms within days of the accident supports a conclusion that the cervical spine injury is causally related to the workplace accident. Dr. Pratt's conclusion was based in part on Jones' subjective history and in part on a pain diagram that Jones filled out for Dr. Babb. On the pain chart, Jones indicated that he was experiencing pain down into his arms. Dr. Pratt stated that having pain down into the arms was consistent with cervical spine involvement. The District emphasizes the fact that Jones did not complain of numbness or tingling when he was being treated by Dr. Babb. Dr. Pratt

9

directly addressed this by noting that Jones did not directly complain of cervical spine symptoms when Jones went to Dr. Penner for treatment.

Dr. Pratt's opinion provides evidence that a reasonable person could use to support a conclusion that the cervical spine injury arose from Jones' 2011 workplace accident. The conclusions of Drs. Grundmeyer and Murati that the cervical spine injury arose from the workplace accident provide additional support to conclude there is sufficient evidence. While the conflicting evidence from Drs. Babb and Fevurly casts some doubt about the conclusion, their opinions do not wholly undermine the conclusion that Jones' cervical spine injury arose from his workplace accident.

Based upon the record, it is possible that Jones' cervical spine injury arose after the 2011 injury. However, the ALJ made a decision based upon credible evidence. The evidence the ALJ used supported its conclusion that it was more probable than not that Jones' cervical spine injury arose from his workplace accident. Put another way, the conflicting evidence in this case does not undermine our confidence that the conclusion is supported by sufficient evidence. See *Messner*, 48 Kan. App. 2d at 750. There is certainly sufficient evidence to support the ALJ's conclusion.

*The District's credibility argument is not persuasive.*

In a repackaging of the prior argument, the District challenges the ALJ's and the Board's findings on the credibility of the witnesses. Essentially, the District contends that Dr. Pratt is not credible because the information he received from Jones was flawed. As we pointed out previously, Dr. Pratt's opinion was not based solely on the information that he received from Jones, but also on Jones' medical records as well as the opinions of the other doctors who had examined Jones. Dr. Pratt believed that Jones was magnifying the extent of his symptoms to some extent, but still determined that the cervical spine injury arose from the 2011 workplace accident.

10

We do find the District's challenge to Dr. Pratt's credibility to be inconsistent. We explain. In the companion appeal, the District used Dr. Pratt's testimony suggesting that due to preexisting permanent work restrictions that should have been made after Jones' 2011 injury, the task losses suffered by Jones from his 2014 work injury must be reduced. The District certainly argued he was credible when he offered that evidence. By attempting to undermine Dr. Pratt's conclusion here, the District is undermining its own position in the companion appeal. In other words, the District seems to argue that Dr. Pratt is credible when his evidence supports the District's position, but not credible when his evidence hurts the District's position. A witness is either credible or not credible.

Because the District has not met its burden to persuade us to the contrary, we affirm the Board's finding that Jones sustained injuries to both shoulders and his cervical spine as a result of his workplace accident in 2011.