No. 60,044

Americare Properties, Inc., d/b/a Russell Kare Center and Ala-Fern Nursing Home, *Appellees*, v. State Department of Social and Rehabilitation Services, *Appellant*.

(738 P.2d 450)

Opinion filed June 12, 1987.

*Michael George*, chief litigation counsel, argued the cause, and *Bruce A. Roby*, of State Department of Social and Rehabilitation Services, was on the briefs for the appellant.

*Eugene T. Hackler*, of Hackler, Londerholm, Corder, Martin & Hackler, Chartered, of Olathe, argued the cause and was on the briefs for the appellees.

*Frank W. Layman*, of Topeka, was on the *amicus curiae* brief for the Kansas Department of Health and Environment.

The opinion of the court was delivered by

Miller, J.: This is an appeal by the State Department of Social and Rehabilitation Services (SRS) from an order of the Shawnee County District Court granting judgment to the plaintiff, Americare Properties, Inc., d/b/a Russell Kare Center and AlaFern Nursing Home, in the amount of $106,928.29, plus interest, costs,

and attorney fees. Appeal was timely, and the case was transferred to this court pursuant to K.S.A. 20-3018(c).

The facts are not in dispute. Russell Kare Center and AlaFern Nursing Home are two adult care homes, classified as intermediate care facilities and located in Russell, Kansas. Plaintiff, Americare Properties, Inc., entered into an agreement for the purchase of Russell Kare Center and for the lease with option to buy AlaFern Nursing Home. The change in ownership took place on September 30, 1984. Both transactions constitute a change of ownership under SRS regulation, K.A.R. 30-10-1b(c)(2), (4).

At the time of the transfer, both facilities were covered by provider agreements, which are prerequisites to participation in the federal Medicaid program. Russell Kare Center's provider agreement did not expire until June 30, 1985, and the AlaFern Nursing Home agreement did not expire until March 31, 1985. Both homes were also licensed with the Kansas Department of Health and Environment (KDHE), AlaFern's license extending until March 31, 1985, and Russell Kare's license to June 30, 1985.

Provider agreements are entered into between the adult care facility and the SRS. K.A.R. 30-10-1c. Licenses for adult care homes are issued by the Department of Health and Environment. K.A.R. 28-39-77.

KDHE was notified of the impending sale of both homes on August 31, 1984. On October 1, 1984, immediately after the change in ownership, Americare called SRS and requested all applications necessary for a change of ownership. An exchange of calls and correspondence followed. On October 16, the provider applications were sent to SRS, and on November 5 an application for licensure was directed to the KDHE. Ultimately, on November 26, 1984, a license was issued by KDHE to the new owners for each facility.

SRS refused to reimburse Americare for services rendered between October 1, 1984, the day Americare took over operation of the two homes, and November 26, 1984, the day on which the licenses were issued. As a result of this decision, Americare was denied Medicaid reimbursement in the amount of $106,928.29. On administrative appeal, the Chief Hearing Officer affirmed SRS's decision to deny payment, and the State Appeals Committee affirmed. Americare appealed to the Shawnee County

District Court, which reversed the agency decision and allowed Americare to recover the disputed reimbursement. The trial judge aptly stated the reasons for his decisions as follows:

"The scope of review of the district court over an administrative action is stated in K.S.A. 77-621. The issue before the Court concerns respondent's interpretation of the law: Whether or not respondent properly relied on state licensure requirements to rule that a medicaid provider agreement becomes void when it passes to a nonlicensed new owner. The Court may grant relief to petitioners only if it determines 'the agency has erroneously interpreted or applied the law.' K.S.A. 77-621(c)(4). Petitioner claims that federal regulations require respondent to pay for medicaid payments totalling $106,928.29 for services rendered to residents of its two nursing homes. Respondent admits to the amount of money involved in the matter but claims it rightfully withheld reimbursement.

"Under Kansas law, an adult care home may not operate without a license. K.S.A. 39-926. These licenses are not transferable. K.S.A. 39-928. The federal regulations concerning the transfer of provider agreements state that where an owner of a facility receiving reimbursement for services rendered medicaid recipients under a provider agreement transfers ownership of the facility, the provider agreement is automatically assigned to the new owner. 42 C.F.R. sec. 442.14(a). Respondent claims that in those situations where a new owner had delayed in obtaining a license, the provider agreement automatically transfers to the new owner, but it immediately becomes null and void because of the new owner's nonlicensed status. The Court finds that respondent's method of reconciling the conflict between Kansas law and 42 C.F.R. sec. 442.14 thwarts the purpose of the federal regulation. 'A state is not obligated to participate in the medicaid program; however, once it has voluntarily elected to participate, the state must comply with federal standards.' *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763, 620 P.2d 1140 (1980). 42 C.F.R. sec. 442.14 makes reference to the Federal Register, 45 F.R. 22935, Apr. 4, 1980, which comments on the fact that some state laws prohibit transfer of a license to a new owner, so an automatic transfer of a provider agreement would make a state violate its own rules. The Comment responds to this concern by stating that the primary goal of automatic assignment 'is to protect beneficiaries and recipients against interruption of coverage.' The Comment also states:

" 'All providers are required to be in compliance with State and local laws as condition of participation. If the State, after a licensure survey, refuses to issue a license because of noncompliance with State law, the facility would no longer be eligible to participate in the Federal programs. It must be remembered that this regulation refers to transfers of provider agreements and not to transfers of State licenses.'

In this case, there was a delay in getting a license, not a refusal of state licensure. The Court finds the automatic transfer regulation clearly applies to the situation where a new owner takes over a nursing home, provides the proper care, but does not receive an automatic license from the state. This is the very situation where

beneficiaries and recipients should not be punished for a delay in getting a state license.

"The Court finds that the SRS erroneously interpreted the law when it held the provider agreement void in the hands of the new owner. The Court understands that the policy of nonpayment for services rendered while unlicensed was meant to discourage new owners from procrastinating in their compliance of state law upon change of ownership. However, because of 42 C.F.R. sec. 442.14 and its clear intent to guard against interruption of medicaid, the Court finds the SRS should use other methods to ensure timely compliance with the state licensure law.

"Therefore, for the reasons stated above, the Court grants relief to petitioners in the amount of $106,928.29, plus interest and costs."

State law, on the one hand, requires a license to operate an adult care home. K.S.A. 39-926. Operating an adult care home without a license subjects the offender to a fine of not more than $100, or imprisonment in a county jail for a period of not more than six months, or both. K.S.A. 39-943. Licenses are not transferable. K.S.A. 39-928. Further, Kansas regulations require new owners to apply for new provider agreements. K.A.R. 30-10-1b(c)(2), (4).

The federal regulation, however, provides as follows:

"*Assignment of agreement.* When there is a change of ownership, the Medicaid agency must automatically assign the agreement to the new owner." 42 C.F.R. § 442.14(a) (1986).

Additionally, the federal regulation provides that assigned agreements are subject to all applicable statutes and regulations and to the terms and conditions under which the original agreement was issued. The purpose of the federal regulation is to provide continuity of coverage for beneficiaries and recipients, whenever there is a change of ownership. See federal comments accompanying the publication of 42 C.F.R. § 442.14. 45 Fed. Reg. 22,935 (1980).

The State reconciled these conflicting statutes and regulations by finding that the provider agreement was automatically assigned, but once assigned, immediately became null and void because of the unlicensed status of the homes.

One of the examples relied upon by the Chief Hearing Officer was an instance in which the operator of a licensed nursing home, who had been leasing the physical property, bought the property. This created a change of ownership, and the home was

denied reimbursement for Medicaid services during the period of time between the purchase and the issuance of a new license. It does not appear to us that such procedure comports with the purpose of the federal regulation.

In the case at hand, both Russell Kare Center and AlaFern Nursing Home were licensed and held provider agreements at the time of the transfer of ownership. There is nothing in the record to indicate that either KDHE or SRS inspected the premises during the unlicensed interim period, or that the services to the recipients fell below standards during that time, or that Americare or any of its employees or the homes were unqualified for licensure under any state statute or regulation. The federal regulation requires providers to meet state license standards; apparently, although its application to the state was tardy, Americare met those requirements. The agency decision to deny payment was based on an SRS "policy" effective March 15, 1984, and announced in the Kansas Medicaid/MediKan Bulletin:

"REIMBURSEMENT RELATED TO OWNERSHIP CHANGES MODIFIED MARCH 15, 1984

Effective March 15, 1984, SRS will not reimburse services in adult care homes not licensed by the Department of Health and Environment (H & E). This policy, consistent with Kansas law, requires that in cases of ownership change the new owner cannot be reimbursed for any days which follow ownership change that are prior to relicensure by H & E."

This "policy" was not adopted as a regulation, but was established by SRS after some facilities were found to be operating without licenses following an ownership change. While this policy is intended to prod new owners into prompt action in securing a license, the policy does not appear to take into account the principal purpose of the federal regulation: to provide continued services for beneficiaries and recipients, and guard them against interruption of coverage.

We agree with the district court that SRS erroneously interpreted the law when it held that the provider agreements were transferred but immediately became void in the hands of the new owner. Federal law preempts state law to the extent that state law conflicts with federal law. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 55 L. Ed. 2d 179, 98 S. Ct. 988 (1978). The preemption doctrine applies to regulations as well as statutes.

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 81 L. Ed. 2d 580, 104 S. Ct. 2694 (1984). The intent of the federal agency in enacting the automatic transfer regulation was clearly to avoid lapses in coverage when a facility changes ownership. Allowing the State to withhold payments squarely defeats that purpose. We conclude that the federal regulation is controlling, and, under the specific facts of this case, we hold that Americare Properties, Inc., is entitled to recover Medicaid reimbursement in the amount of $106,928.29, plus interest and costs.

One other issue remains. The district court awarded attorney fees, to Americare. K.S.A. 77-622 governs the relief available upon the appeal of agency decisions. Subsection (c) allows the court to award attorney fees only to the extent expressly authorized by other law. K.A.R. 30-10-12(b)(4)(A)(ii)(cc) (1983, revoked May 1, 1985), cited by the trial court in its opinion as authority for the awarding of attorney fees, discusses costs related to the appeal. It does not specifically mention attorney fees, and does not provide for the recovery of such fees by the appellant. We conclude that attorney fees are not recoverable in this action.

The judgment of the district court awarding Americare relief in the amount of $106,928.29, plus interest and costs, is affirmed; the judgment permitting recovery of attorney fees is reversed.