NOT DESIGNATED FOR PUBLICATION

No. 113,744

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN R. KARR,
*Appellee*,

v.

MID CENTRAL CONTRACTORS

and

EMPLOYERS MUTUAL CASUALTY CO.,
*Appellants.*

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed December 11, 2015. Affirmed.

*D'Ambra M. Howard* and *Ryan D. Weltz*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, for appellants.

*William L. Phalen*, of Pittsburg, for appellee.

Before MALONE, C.J., HILL and STANDRIDGE, JJ.

*Per Curiam:* Mid Central Contractors and its insurance carrier, Employers Mutual Casualty Co., appeal the Workers Compensation Board's order affirming the administrative law judge's award of workers compensation benefits to John Karr. Specifically, Mid Central argues the Board erred in finding Karr suffered a permanent functional impairment rating that would allow him to receive permanent partial disability

1

compensation payments. Mid Central also challenges the Board's determinations of Karr's work loss and task loss. Because the Board did not err in making that award, we affirm.

The factual background of this case is undisputed. Karr was a laborer for Mid Central in July 2011. The parties stipulated that Karr suffered a work-related accident on July 7, 2011, while installing gates under a power line. A 2,000 pound post hole driver fell from a skid loader and struck Karr across the shoulders and back. Karr was transported to the hospital where he was treated and evaluated, given medication, and told to follow up with occupational health services.

Shortly after, Karr came under the care of Dr. Dennis Estep. Dr. Estep initially diagnosed lumbar contusion, pelvic contusion, and lumbosacral sprain. A subsequent magnetic resonance imaging revealed chronic degenerative disc disease and mild facet effusions with no indication of any fractures or a herniated disc. Dr. Estep believed Karr was not a candidate for surgery and instead treated Karr conservatively by providing medication, imposing work restrictions, and referring him for a course of physical therapy.

Karr sought workers compensation benefits in July 2012. In December 2012, Dr. Estep discontinued physical therapy and referred Karr to Dr. Sadie Holland for pain management. The sacroiliac joint injections Dr. Holland provided to Karr gave him no relief. Dr. Estep determined Karr to be at maximum medical improvement on March 5, 2013, and released Karr from his care. Dr. Estep concluded Karr sustained a 5 percent permanent whole body functional impairment and recommended that Karr return to work with no restrictions. Dr. Estep used the Diagnosis-Related Estimates Model in the American Medical Association, Guides to the Evaluation of Permanent Impairment (4th ed. 1995) in forming his opinion.

2

Dr. Edward Prostic examined Karr in September 2012 at his counsel's request. Dr. Prostic initially concluded Karr sustained an injury to the costochondral cartilages and lumbar spine because of the July 2011 work-related accident. Dr. Prostic recommended Karr undergo further conservative treatment.

Karr returned to Dr. Prostic in May 2013 for another evaluation. Karr complained of frequent pain in his lower right back and soreness about the front of his right thigh, worsened by most activities. Dr. Prostic reviewed Karr's updated medical records regarding his treatment with Dr. Estep and Dr. Holland and concluded Karr sustained injuries to his chest, low back, and sacroiliac joint because of the July 2011 accident. Dr. Prostic believed Karr's resulting injuries from the work-related accident were the prevailing factor causing Karr's injury, medical condition, need for medical treatment, and the resulting disability and impairment. Dr. Prostic concluded Karr sustained a 13 percent permanent, partial impairment of the body as a whole on a functional basis. In forming his opinion, Dr. Prostic found the DRE Model not applicable to assess Karr's impairment and instead used the Range of Motion Model from the AMA Guides. Dr. Prostic recommended Karr be restricted to a medium level of employment.

Shortly after his accident, while he was still under Dr. Estep's care, Karr had returned to work for Mid Central in an accommodated position sweeping and cleaning. After about 3 weeks, Karr returned to the construction crew operating the skid loader, a lighter position. Karr reported he was having problems operating the skid loader and was transferred to driving a dump truck, an even lighter position. Karr then reported that driving the dump truck bothered his back. He was moved to a position in the substations, where he tied rebar and was required to bend over throughout the day. Karr told Mid Central this new position continued to aggravate his back pain. Karr was laid off in November 2013. He applied for and received unemployment benefits for 5 months following his termination. Karr certified on his application that he was ready, willing, and able to work.

3

Karen Terrill, a vocational rehabilitation expert, interviewed Karr in June 2014 at his counsel's request. Terrill determined Karr had no transferable job skills and identified two types of jobs within Dr. Prostic's employment restrictions for Karr. Based on the $327.60 average weekly salary of two identified jobs in Karr's labor market and not taking into account fringe benefits, Terrill found that Karr had sustained a 56 percent wage loss. Dr. Prostic reviewed the task list prepared by Terrill and determined that Karr had lost the ability to perform 5 of the 10 described tasks on the list for a 50 percent task loss.

At Mid Central's request, Michelle Sprecker, a certified vocational rehabilitation counselor, interviewed Karr in June 2014. Sprecker identified five types of jobs with an average weekly salary of $517.04 that fell within Dr. Prostic's employment restrictions for Karr. However, the three positions Sprecker identified as available in Karr's labor market with an average weekly salary of $381.60 only fell under two of the five types of jobs she identified. Utilizing Dr. Estep's opinion of no work restrictions, Sprecker found that Karr had sustained an 18.4 percent wage loss. Dr. Estep reviewed the task list generated by Sprecker and found that of the 11 unduplicated tasks on the list, Karr could perform all of the tasks, for a 0 percent task loss.

ALJ Brad E. Avery issued his award on October 29, 2014. He gave equal deference to Dr. Estep's and Dr. Prostic's functional impairment ratings and concluded Karr sustained a 9 percent permanent whole body functional impairment. The ALJ made two work disability determinations. The ALJ similarly gave equal deference to the vocational experts' opinions as to Karr's earning capability in his labor market, calculating the amount at $377.20. Then, based on a 49 percent wage loss and Dr. Prostic's assessment of a 50 percent task loss, the ALJ found Karr sustained a 49.5 percent work disability from November 13, 2013, until November 29, 2013. And based on a 50 percent wage loss and a 50 percent task loss beginning on November 30, 2013, the ALJ concluded Karr sustained a 50 percent work disability from that date onward.

4

Mid Central sought Board review of the award, arguing the ALJ erred in (1) finding that the functional impairment rating was met and (2) in determining the appropriateness of the work disability compensation. The Board, after making additional findings of fact, affirmed the ALJ's functional impairment rating of 9 percent. The Board, however, determined that the ALJ's work disability mathematical calculations were erroneous. After agreeing with the ALJ to average the two calculations by the vocational experts of the average weekly salary of available positions in Karr's labor market, the Board found Karr was capable of earning $354.60 a week, not $377.20. Then, the Board found, based on a 50 percent task loss and 52 percent wage loss, that Karr had sustained a 51 percent work disability before November 30, 2013, and a 52 percent work disability beginning this date given the respective 54 percent wage loss.

*The functional impairment rating has been properly determined.*

Mid Central first argues that the Board erroneously relied in part on Dr. Prostic's functional impairment rating of Karr's condition because the AMA Guides required that the Range of Motion Model Dr. Prostic used to rate Karr's functional impairment only be used when the DRE Model is inapplicable. Mid Central contends that because Dr. Estep used the DRE Model to rate Karr's functional impairment, the Board should have disregarded Dr. Prostic's 13 percent functional impairment rating and based its decision solely on Dr. Estep's 5 percent rating.

In determining an injured worker's functional impairment, K.S.A. 2011 Supp. 44-510e(a)(2)(B) requires the presentation of medical evidence based on the AMA Guides:

> "The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and based on the fourth edition of the American [M]edical

5

[A]ssociation [G]uides to the [E]valuation of [P]ermanent [I]mpairment, if the impairment is contained therein."

An injured worker may be eligible to receive work disability compensation in excess of the percentage of functional impairment if "[t]he percentage of functional impairment determined to be caused solely by the injury exceeds 7 1/2 % to the body as a whole . . . ." K.S.A. 2011 Supp. 44-510e(a)(2)(C)(i).

Our review of this case is governed by the Kansas Judicial Review Act. K.S.A. 77-601 *et seq.*; K.S.A. 2014 Supp. 44-556(a). The burden of showing the Board erred is on the party claiming error. See K.S.A. 2014 Supp. 77-621(a)(1). We review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported to the appropriate standard of proof by substantial evidence. See K.S.A. 2014 Supp. 77-621(c)(7). In doing so, we shall not reweigh the evidence or engage in de novo review. K.S.A. 2014 Supp. 77-621(d).

The standard of proof before the Board is a preponderance of the evidence. See K.S.A. 2014 Supp. 44-508(h). "[I]n light of the record as a whole" is statutorily defined as: "[T]he adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding . . . ." K.S.A. 2014 Supp. 77-621(d). Although not statutorily defined, substantial evidence refers to evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis of fact from which the issue raised could be easily resolved. *Ward v. Allen County Hospital*, 50 Kan. App. 2d 280, 285, 324 P.3d 1122 (2014).

Additionally, Mid Central invokes K.S.A. 2014 Supp. 77-621(c)(4) as the basis for our jurisdiction to review the Board's order. Under that subsection, we can grant Mid Central relief if we determine that the Board erroneously interpreted or applied the law. Our review over such a question of law is unlimited. We also owe no deference to the Board's interpretation or construction of the law. *Messner v. Continental Plastic Containers*, 48 Kan. App. 2d 731, 741, 298 P.3d 371, *rev. denied* 297 Kan. 1246 (2013). As mentioned, Mid Central must show how the Board erred. See K.S.A. 2014 Supp. 77-621(a)(1).

After reviewing this issue, we conclude that while the AMA Guides indicates that the DRE model is preferred in determining spine impairment, an evaluator does not deviate from the AMA Guides if the DRE Model is not used in assessing the injury. See AMA, Guides 94. The statute, K.S.A. 2011 Supp. 44-510e(a)(2)(B), specifically contemplates the existence of impairment ratings not "contained therein." Indeed, the instructions for the AMA Guides provide that the evaluator should use the DRE Model if the patient's condition fits within one of the eight categories listed in Table 70. If the patient's condition does not, the instructions direct that the evaluator should use the Range of Motion Model. The instructions for the AMA Guides further state that all evaluators must use either the DRE Model or Range of Motion Model in making the final rating and if one model is used according to the recommendations in the AMA Guides then the other model is usually not pertinent. However, the instructions clarify that "if disagreement exists about the category of the Injury Model [also called the DRE Model] in which a patient's impairment belongs, then the Range of Motion Model may be applied to provide evidence on the question." AMA, Guides 94.

Dr. Prostic's use of the Range of Motion Model does not render his rating opinion unworthy of consideration. Dr. Prostic testified he believed the DRE Model was inapplicable because Karr had a preexisting back disease, or a degenerative disc, and that Table 70 did not accurately describe Karr's condition. In clarifying why the DRE Model

7

did not accurately describe Karr's impairment, Dr. Prostic explained reasons why he did not use the model:

> "[T]he instructions in the [AMA] Guides on page 99 is to use the Range of Motion Model to confirm the DRE, and if the Range of Motion Model and the DRE disagreed significantly, pick the DRE closest to the Range of Motion Model. Well, I thought that the fact that it didn't describe the SI joint injury and because [Karr] had 11 percent just for range of motion, not including the degenerative disk disease, I thought 5 percent for sprain and strain was not sufficient."

Dr. Prostic did agree that if he had to use one of the DRE categories, he would say Karr fits in Category II, or a 5 percent functional impairment rating. Dr. Prostic nevertheless clarified, "If you twisted my arm behind my back and said that's all I can use, then I agree, but I still need something different for the [sacroiliac] joint."

Dr. Estep's testimony supported Dr. Prostic's assertion that Table 70 did not accurately describe Karr's condition. When asked at his deposition whether he agreed that Karr's condition did not fit any of the conditions in Table 70, Dr. Estep stated, "I would agree." In fact, Dr. Estep testified that he used Table 72 of the AMA Guides to find that Karr fits in DRE Category II. Table 72 describes DRE Category II as a 5 percent impairment rating requiring clinical signs of lumbar injury but with no radiculopathy or loss of motion. AMA, Guides 110. In other words, Dr. Estep relied on the descriptions and distinguishing characteristics of the various DRE categories in Table 72 to label Karr's condition and assign him a DRE Category II rating, despite the AMA Guides instructing that the evaluator only assign one of the eight DRE categories using the DRE Model "if the patient's condition is one of those listed in Table 70." AMA, Guides 94.

We cannot conclude that the Range of Motion Model was not pertinent in providing evidence on the question of the final impairment rating when the record appears to indicate that the DRE model Dr. Estep relied upon was not even used

according to the recommendations in the AMA Guides. We find that Dr. Prostic's testimony provided the Board substantial competent evidence to support its finding that Dr. Prostic's functional impairment rating was as "equally credible" as Dr. Estep's rating.

*The Board's disability determination is correctly calculated.*

Mid Central next argues there was insufficient evidence to support the Board's determination of wage loss or Karr's ability to earn a comparable wage. "Wage loss" is "the difference between the average weekly wage the employee was earning at the time of the injury and the average weekly wage the employee is capable of earning after the injury." K.S.A. 2011 Supp. 44-510e(a)(2)(E).

Mid Central points us to the facts that Karr had made a comparable wage working for it after the accident, had received unemployment benefits under the premise that he was able to work, and Dr. Estep had not given Karr any work restrictions. In Mid Central's view, this shows where the evidence was insufficient to support the Board's finding. This is a request by Mid Central to have us reweigh the evidence, something the KJRA restricts us from doing. See K.S.A. 2014 Supp. 77-621(d). Instead, Mid Central must show the Board's determination was not supported by substantial competent evidence.

The Board based its determination of wage loss on the reports of both vocational experts of the average weekly salary of positions available to Karr in his labor market. There is no support for Mid Central's argument that a claimant after being injured who attempts to work while in pain, even against medical restrictions, is precluded from later seeking compensation under the statutory formula.

The Board did not err in finding Karr suffered a 52 percent wage loss before November 30, 2013, and a 54 percent wage loss thereafter.

9

Mid Central also challenges the record supporting the Board's determination of task loss. "Task loss" is "the percentage to which the employee, in the opinion of a licensed physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the five-year period preceding the injury." K.S.A. 2011 Supp. 44-510e(a)(2)(D).

The Board based its determination of task loss solely on Dr. Prostic's opinion that evaluated Terrill's list of the work tasks Karr had performed in previous jobs. Mid Central argues that we should find Dr. Estep's opinion regarding task loss "more credible" than Dr. Prostic's assessment. This is also clearly an invitation by Mid Central to have us reweigh the evidence. See K.S.A. 2014 Supp. 77-621(d). We decline to do so.

The Board did not err in finding Karr suffered a 50 percent task loss.

*We grant Karr's motion for attorney fees.*

According to Supreme Court Rule 7.07(b)(1) (2015 Kan. Ct. R Annot. 72), an appellate court can award attorney fees for services on appeal in a case in which the district court had the authority to award attorney fees. Karr makes such a request in this case.

While this case does not arise from a district court, it does arise from an agency that routinely awards attorney fees—the workers compensation division. The spirit of Rule 7.07(b)(1) appears to be that if the lower tribunal can award fees, then an appellate court, being the proper authority to determine the reasonableness of appellate fees, can, as an exercise of discretion, award attorney fees for attorney services on appeal. For example, attorneys are entitled to fees for services such as:

10

- A decision of an ALJ that is reviewed by the Board;
- review of a modification of an award;
- requests for post-award medical treatment.

See generally K.S.A. 2014 Supp. 44-551(l)(1); K.S.A. 2014 Supp. 44-536(g); and K.S.A. 2014 Supp. 44-510k(c).

Mid Central and its insurer, Employers Mutual, argue that since there is no provision in the Workers Compensation Act to pay appellate attorney fees, we cannot make an award. That is not true.

When other statutes have mentioned appellate attorney fees, the Kansas Supreme Court has held that "the determination and award of attorney fees must be made at each step of the proceedings." *Fisher v. Kansas Crime Victims Comp. Bd.*, 280 Kan. 601, 617, 124 P.3d 74 (2005). In *Evans v. Provident Life & Accident Ins. Co.*, 249 Kan. 248, Syl. ¶ 10, 815 P.2d 550 (1991), the court held:  "Where an award of attorney fees pursuant to K.S.A. 40-256 is sought for appellate services, Rule 7.07 (1990 Kan. Ct. R. Annot. 37) requires that the appellate court in which said services were rendered determine the matter." In *Fisher*, the Kansas Supreme Court applied the holding in *Evans* to an action for judicial review. 280 Kan. at 616-17. Similarly, we find the analysis in *Evans* to be applicable in this workers compensation case.

If a statute permits a lower court or tribunal to award attorney fees for work performed before it, then an appellate court can award fees for work on appeal. See *Darnall v. Lowe*, 5 Kan. App. 2d 240, 244, 615 P.2d 786 (1980). Here, K.S.A. 2014 Supp. 44-536(g) authorizes an award of attorney fees for work before the workers compensation board which, in turn, permits this court to award fees in compliance with K.S.A. 77-622(c).

11

If no attorney fees were ever awarded in workers compensation cases, then we would not award them for appellate work. See *Americare Properties, Inc. v. S.R.S.*, 241 Kan. 607, 612, 738 P.2d 450, *cert. denied* 484 U.S. 964 (1987), where the court concluded that a reviewing court does not have authorization to award attorney fees when a statute does not give the agency authorization to award *any* attorney fees.

Karr's motion for $5,240 in attorney fees is granted under Supreme Court Rule 7.07(b)(1).

Affirmed.