NOT DESIGNATED FOR PUBLICATION

No. 114,824

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TREVOR EDER,
*Appellee*,

v.

HENDRICK TOYOTA,
and
HARTFORD INSURANCE COMPANY OF THE MIDWEST,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed December 16, 2016. Affirmed in part and remanded.

*Jeff S. Bloskey*, of McCormick, Gordon, Bloskey & Poirier, of Overland Park, for appellants.

No appearance for appellee.

Before MCANANY, P.J., PIERRON, J., and BURGESS, S.J.

*Per Curiam*: In June 2011, Trevor Eder was working as an automotive technician at Hendrick Toyota. He had been working there since 2003. His work duties as an automotive technician required a lot of bending and lifting. On a regular basis, he lifted objects ranging from 30 to 60 pounds all the way up to 120 to 150 pounds. Some repair work also had to be performed in awkward positions, including looking up with his hands extended above his head.

1

According to Eder, performing these job duties for several hours a day over 8 years eventually caused him to have neck pain. Two to three months prior to June 22, 2011, Eder began to have aches and pains in his neck but the pain remained stable over that period. Eder testified that he woke up on Monday, June 22, 2011, with a shooting pain in his neck. He did not recall working on the weekend prior or doing anything at home that could have injured him.

There is some confusion in this case about the dates. Eder's testimony was that his neck began hurting on Monday, June 22, 2011, and he went to Corporate Care that day. June 22, 2011, was a Wednesday, and the records indicate that Eder went to Corporate Care on June 30, 2011. The parties seemed to have agreed to use the date June 22, 2011, as the onset of his symptoms.

During the months preceding his injury, Eder also performed automotive repair work for a used car lot as well as friends and family at his home. The amount of work he performed varied depending on how many hours he worked at Hendrick. If he worked 60 hours at Hendrick, he might work 10 hours at home. If he worked 40 hours at Hendrick, he might work 15 hours at home. He testified 15 hours was the most he ever worked at home in a week. The work he did at home was similar to what he did at Hendrick but with less heavy lifting. Eder testified, however, that he did not perform any work at home prior to his June 2011 injury.

Eder called Hendrick Toyota's service manager, Scott Kelford, to tell him he was having severe pain and would not be able to come into work that day. Eder told Kelford that he could not link his injury to a specific event, but he did not know where else the injury could have occurred other than work. At the time, Eder was doing a lot of work on truck frames due to a recall. He did not specifically tell Kelford that he thought his injuries were work-related until his second surgery in 2012.

2

On the same day Eder reported his injury to Kelford, he went to the company-designated clinic, Corporate Care. Eder saw Dr. Knudson at Corporate Care. He told Dr. Knudson he did not have a specific accident, but he said his job duties may have contributed to his injury. Dr. Knudson concluded the injury was not work related and recommended Eder seek treatment from his personal physician. Eder did not receive any further treatment from Corporate Care, but he did seek treatment on his own from Dr. O'Boynick.

Eder had a disk herniation at his C6-C7 vertebrae, and Dr. Paul O'Boynick performed a fusion one-level fusion on August 9, 2011. Eder did not tell Dr. O'Boynick that his injuries might be work-related. Eder claimed this was because if Dr. O'Boynick knew his injuries were work-related, he would not perform the surgery because he was not a workers compensation doctor. After some physical therapy, Dr. O'Boynick released Eder to work without restrictions on December 16, 2011.

Between June 22, 2011, and December 16, 2011, Eder was off work. During this time, he received paid time off and vacation time. Eder then applied for and got short-term disability, starting on June 29, 2011. His short-term disability then converted to long-term disability, which continued through December 14, 2011.

Before returning to work, Eder got a second opinion from Dr. Tenny on December 1, 2011. Eder told Dr. Tenny he had worked in his shop over the weekend prior to his injury occurring. Dr. Tenny released Eder to work without restrictions.

Eder returned to work on December 16, 2011. He received a raise upon his return. He continued to work full duty at Hendrick until March 5, 2012.

On March 5, 2012, Eder sustained another neck injury while at work at Hendrick. He reported the injury to Kelford and again went to Corporate Care. The doctors at

3

Corporate Care designated his injury as compensable and authorized treatment. After some physical therapy and other treatment, Eder was referred to Dr. Alexander Bailey, a board certified orthopedic surgeon.

Dr. Bailey evaluated Eder on April 5, 2012 regarding his March 5, 2012 injury. He identified a new injury at Eder's C5-C6 vertebrae, adjacent to his prior fusion at C6-7. He characterized the injury as a herniated nucleus pulposus. He also determined there was a causal relationship between Eder's work at Hendrick and the injury.

Dr. Bailey first attempted to treat Eder's injury through conservative means, including physical therapy, medication management, and epidural steroid injections. After Eder failed to improve using these methods, Dr. Bailey recommended surgery. Dr. Bailey performed neck surgery on Eder on July 26, 2012. As part of the surgery, he removed the hardware from the previous fusion, re-fused the C6-C7 vertebrae, and fused the C5-C6 vertebrae. He characterized the surgery as a two-level fusion.

Dr. Bailey released Eder to work with some restrictions on September 30, 2012. In January, 2013, Dr. Bailey rated Eder with a 15% permanent partial whole body impairment as a result of the March 5, 2012, injury. On January 6, 2013, Dr. Bailey placed Eder on maximum medical improvement and released him to work without any restrictions.

Eder had begun to look for new employment shortly after his second surgery. Because he had not found another position prior to September 30, 2011, he returned to work at Hendrick. He also received another raise upon his return. However, he continued to have chronic neck pain and headaches. He sought treatment for pain management during this period. Eventually, he resigned from Hendrick on February 15, 2013, due to his neck pain.

4

After his resignation, Eder took a new job as a claims adjuster. He took the job because it did not require the heavy lifting and awkward positions of his former work as an automotive technician. He continued to have chronic neck pain, which caused him to miss time at his new job. Eventually, Eder resigned from his position in June 2014.

Eder met with Michael Dreiling, a vocational consultant. Dreiling made a list of job duties and what each job duty physically entailed. The list contained a total of 16 job tasks.

Dr. Preston Brent Koprivica, a board certified occupational medicine physician, saw Eder on April 1, 2013 at Eder's attorney's request for an independent medical examination (IME). Dr. Koprivica obtained a medical history from Eder, examined him, and reviewed a number of medical records and diagnostic studies. Based on this information, Dr. Koprivica concluded Eder's June 2011 neck injury was the result of cumulative injury due to his work as an auto technician, and his work was the prevailing factor in the development of his injury. Due to this injury, Eder was temporarily and totally disabled between June 2011 and December 2011. Following his first surgery, Eder had a 15% whole person impairment. Dr. Koprivica also concluded that the treatment Eder received for his injury between June 2011 and December 2011 was reasonable and necessary.

Dr. Koprivica testified that Eder had not informed him that he had been doing automotive work at home over the weekend prior to developing his June 2011 injury. He stated that, assuming that were true, it would suggest a temporal relationship between what he did at home and his injury.

Dr. Koprivica similarly concluded Eder's specific accident was the prevailing factor in the development of his neck injury on March 5, 2012. He specifically noted that the second injury did not result due to an increased risk caused by the first injury. The

second injury resulted in a 25% whole person impairment, separate from and in addition to his previous 15% impairment. In his opinion, Eder should have permanent work restrictions, and the March 5, 2012, injury was the prevailing reason for the permanent restrictions. Eder would also need lifelong treatment based on the March 5, 2012, injury.

Dr. Koprivica also reviewed Dreiling's report. The report identified 16 job tasks performed by Eder in his 5-year work history. Dr. Koprivica testified Eder would not be able to perform 12 of those tasks for a 75% task loss. He attributed this task loss to both of Eder's work injuries, but he also testified the March 5, 2012, injury alone would have resulted in the same task loss.

Dr. Terrence Pratt did a court-ordered IME on Eder on October 29, 2013. Dr. Pratt took a history from Eder and reviewed prior medical records. He noted that Eder did not have any reported cervical neck pain prior to June 2011. Eder reported to Dr. Pratt that he had been "doing repetitive activities as a technician, resulting in a slow onset of symptoms over a weekend working with truck frames without a specific event." Dr. Pratt did not recall Eder telling him he did automotive repair work at home, but he did review Dr. Tenny's medical records stating Eder had worked at home the weekend before the onset of his symptoms. He did agree that there would seem to be a temporal relationship between what Eder was doing over the weekend and the onset of his symptoms.

In his report, Dr. Pratt concluded that the only known factors contributing to both of Eder's injuries were work-related activities and preexisting degenerative changes in his spine. Dr. Pratt determined that Eder had preexisting degenerative changes to his cervical spine based on an MRI of Eder's cervical spine performed on July 14, 2011. Dr. Pratt noted "[t]here was potential for aggravation of the underlying degenerative changes with his activities."

6

Dr. Pratt testified that the activities Eder performed at Hendrick would have been a more significant factor in his injury than any work he did at home. It would also be possible with repetitive-type injuries for symptoms to emerge several days after a triggering event. Dr. Pratt testified that after the June 2011 injury Eder had a 15% permanent whole body impairment. He also testified Eder's work at Hendrick was the prevailing factor in his injury, even considering Eder did some automotive work at home.

Dr. Pratt testified that as a result of the March 5, 2012, injury Eder sustained a 10% permanent whole body impairment. He testified the specific accident was the prevailing factor leading to Eder's injury and impairment. Dr. Pratt recommended avoidance of awkward positions and avoidance of forceful activities involving torqueing. These were the only permanent restrictions he placed on Eder. He also stated that Eder would most likely need continuing medical treatment.

Dr. Pratt testified that considering the two injuries in which Eder's work was the prevailing factor together, Eder could not perform 9 out of the 16 job tasks identified in Dreiling's report. He also testified that with the restrictions he put in place for the March 2012 injury, Eder could still perform all 16 tasks. He stated he would likely have given Eder restrictions after the June 2011 injury but was not asked to do so. He stated he possibly would have limited Eder to tasks with a light or medium physical demand. He also testified that after Dr. O'Boynick released Eder to work, Eder was capable of performing all 16 tasks through March 5, 2012.

Applying the definition of accident provided in K.S.A. 2012 Supp. 44-508(d), the administrative law judge (ALJ) found that Eder had failed to establish his injury was the result of an accident and was thus not compensable. Accordingly, the ALJ denied all other claims related to Eder's June 2011 injury.

7

The ALJ found that Eder's March 2012 injury was compensable. He found Eder had a 15% preexisting impairment and suffered an additional 15% impairment due to his March 2012 injury. He found Eder suffered a 29% wage loss with a 0% task loss and awarded Eder 14.5% permanent partial disability. The ALJ found Eder was entitled to an award for all medical expenses but that all medical expenses had already been paid. He also found Eder could apply to have his future medical expenses covered.

On review, the Board found that Eder's June 2011 injury was not the result of an accident but rather was a repetitive trauma injury. It also found the injury was compensable but Eder's work exposed him to an increased risk and that risk was the prevailing factor leading to his injury. It found that Hendrick had actual knowledge of Eder's June 2011 injury and thus had proper notice. The Board found Eder had a 15% whole person impairment due to his June 2011 injury and was entitled to temporary total disability from June 22, 2011 to December 15, 2011. It awarded Eder future medical expenses and unauthorized medical expenses up to $500.

As for Eder's March 2012 injury, the Board found Eder had a 16.7% whole body functional impairment and a current work disability of 33.5%. It found that Eder's wage loss varied during the period of time he worked at Zurich but that his current wage loss was 11%. It also found that this finding of wage loss was not precluded by Eder's voluntary resignation.

The Board also found that based on Dr. Pratt's testimony, Eder had a 56% task loss. Combining the 11% wage loss with the 56% task loss, the Board arrived at a 33.5% work disability. The Board affirmed the ALJ's finding that Eder was entitled to future medical treatment and unauthorized medical treatment not to exceed $500. Hendrick filed a petition for judicial review.

Hendrick first argues that Eder's June 2011 injury was not compensable, and the Board erred in finding that it was. He argues that Eder's injury did not arise out of his employment at Hendrick because his job did not expose him to an increased risk. Rather, the risks Eder faced as an automotive technician were a personal risk and a normal activity of Eder's day-to-day life because he did auto repair work at home. Furthermore, his job at Hendrick was likely not the prevailing factor causing his injury because evidence at the hearing suggested he had been doing repair work at home the weekend before his injuries occurred.

When determining fact questions, an appellate court's responsibility is to review the record as a whole to determine whether substantial evidence supports the Board's factual determinations. See K.S.A. 2015 Supp. 77-621(c)(7). "This analysis requires the court to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings." *Williams v. Petromark Drilling, LLC*, 299 Kan. 792, 795, 326 P.3d 1057 (2014) (citing K.S.A. 77-621[d]). The court does not reweigh the evidence or engage in de novo review. K.S.A. 2015 Supp. 77-621(d); 299 Kan. at 795. "Substantial evidence" refers to evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis of fact from which the issue raised could be easily resolved. *Rogers v. ALT-A&M JV*, 52 Kan. App. 2d 213, 216, 364 P.3d 1206 (2015).

"The statute in effect at the time of the claimant's injury governs the rights and obligations of the parties." *Rogers*, 52 Kan. App. 2d at 216. Eder's injury occurred in June 2011. The 2011 amendments to the Workers Compensation Act (Act) became effective in May 2011, so they govern this case. See L. 2011, ch. 55, sec. 29.

According to K.S.A. 2012 Supp. 44-508(e), "'[r]epetitive trauma' refers to cases where an injury occurs as a result of repetitive use, cumulative traumas or microtraumas."

9

An injury is only compensable if it arises out of and in the course of employment. K.S.A. 2012 Supp. 44-508(f)(2). Pursuant to K.S.A. 2012 Supp. 44-508(f)(2)(A), a repetitive trauma injury arises out of employment only if:

> "(i) The employment exposed the worker to an increased risk or hazard which the worker would not have been exposed in normal non-employment life;
> "(ii) the increased risk or hazard to which the employment exposed the worker is the prevailing factor in causing the repetitive trauma; and
> "(iii) the repetitive trauma is the prevailing factor in causing both the medical condition and resulting disability or impairment."

Prevailing factor "means the primary factor, in relation to any other factor. In determining what constitutes the 'prevailing factor' in a given case, the administrative law judge shall consider all relevant evidence submitted by the parties." K.S.A. 2012 Supp. 44-508(g).

Substantial evidence supports the Board's finding that Eder's June 2011 injury was compensable. In order to be compensable, Eder's employment must first have exposed him to an increased risk or hazard to which he would not have been exposed in his normal nonemployment life. See K.S.A. 2012 Supp. 44-508(f)(2)(A)(i). The Board found that Eder's work at Hendrick exposed him to an increased risk because he worked with heavier weights for longer periods of time than he did when doing automotive work at home. Eder's testimony supports this finding. Eder testified he lifted heavier weights at Hendrick than he did while working at home. He testified that he worked 40 to 60 hours per week at Hendrick while performing only 10 to 15 hours a week at home. He also testified that he generally only worked for 60 to 90 minutes at a time at home. Additionally, Eder's testimony regarding his work duties was uncontested. See *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 515, 154 P.3d 494 (2007) ("[A] factfinder cannot disregard undisputed evidence that is not improbable, unreasonable, or untrustworthy. Such evidence must be regarded as conclusive.").

Hendrick argues that Eder's injury was not compensable because Eder exposed himself to the risk of automotive work at home and the hazards of his work were not unique. K.S.A. 2012 Supp. 44-508(f)(2)(A), however, does not require that an employee's job expose an employee to a unique risk or hazard that he or she would not have been exposed to in his or her non-employment life. Rather, the statute requires an *increased* risk or hazard.

K.S.A. 2012 Supp. 44-508(g)(A) is a new amendment to the Act, added in 2011. L. 2011, ch. 55, sec. 5. Thus, there do not appear to be any cases applying or interpreting this new subsection. Previously, however, Kansas courts recognized a general increased risk rule in order to establish a causal connection between an employee's injury and his or her employment. This rule held that "[i]f employment exposes the worker to an increased risk of injury of the type actually sustained, the employer is liable for compensation." *Angleton v. Starkan, Inc.*, 250 Kan. 711, 718, 828 P.2d 933 (1992). Applying this rule, Kansas courts have found a wide variety of work activities represented an increased risk. See, *e.g.*, *Anderson v. Scarlett Auto Interiors*, 31 Kan. App. 2d 5, 11, 61 P.3d 81 (2002) (finding constantly getting in and out of car represented increased risk); *Baggett v. B&G Const.*, 21 Kan. App. 2d 347, 349-50, 900 P.2d 857 (1995) (finding falling down hole in floor at work after being pushed by coworker was increased risk); *Bennett v. Wichita Fence Co.*, 16 Kan. App. 2d 458, 460, 824 P.2d 1001 (1992) (finding driving in car was increased risk).

Admittedly, many of these cases addressed markedly different factual scenarios, specifically accidental injuries that arose out of the combination of a personal risk or preexisting condition and a work condition. Moreover, the 2011 amendments to the Act were so extensive, that these cases may not be directly applicable in interpreting this particular provision. See *Moore v. Venture Corp.*, 51 Kan. App. 2d 132, 138, 343 P.3d 114 (2015) (discussing whether prior caselaw was still applicable under the 2011 amendments to the Act). Looking at these cases, however, there is clearly no precedent

11

for Hendrick's argument that an increased employment risk or hazard be something entirely different from any risk the employee faces in his or her nonemployment life.

Hendrick also argues that "[r]isks to which . . . the worker exposes himself outside of his employment . . . are part of that worker's 'normal activities of day-to-day living.'" Hendrick provides no support for this proposition. Moreover, it is incorrect. Our Supreme Court has provided the following analysis for determining if an activity is a "normal activity of day-to-day living" or a work-related activity:

> "Although no bright-line test for what constitutes a work-injury is possible, the proper approach is to focus on whether the injury occurred as a consequence of the broad spectrum of life's ongoing daily activities, such as chewing or breathing or walking in ways that were not peculiar to the job, or as a consequence of an event or continuing events specific to the requirements of performing one's job. . . .
>
> "Even though no bright-line test for whether an injury arises out of employment is possible, the focus of inquiry should be on . . . whether the activity that results in injury is connected to, or is inherent in, the performance of the job. The statutory scheme does not reduce the analysis to an isolated movement—bending, twisting, lifting, walking, or other body motions—but looks to the overall context of what the worker was doing— welding, reaching for tools, getting in or out of a vehicle, or engaging in other work- related activities." *Bryant v. Midwest Staff Solutions, Inc*., 292 Kan. 585, 595-96, 257 P.3d 255 (2011).

See also *Moore v. Venture Corp.*, 51 Kan. App. 2d 132, 140-43, 343 P.3d 114 (2015)(finding *Bryant* applicable to 2011 amendments to Act).

If an employee performs an action or activity outside of work, an injury resulting from the same activity may still be compensable when the employee does the same activity in connection with work.

12

Next, in order for Eder's injury to be compensable, the increased risk from Eder's employment must have been the prevailing factor in his injury. See K.S.A. 2012 Supp. 44-508(f)(2)(A)(ii). As the Board noted, both Dr. Koprivica and Dr. Pratt testified that Eder's work as an automotive technician was the prevailing factor in his injury. Admittedly, both doctors testified that Eder had not told them about doing auto repair work at home. Nevertheless, Dr. Pratt still concluded that Eder's work at Hendrick was the prevailing factor causing his injury, even after considering that Eder did auto repair work at home. Furthermore, as the Board notes, there was no contrary prevailing factor opinion presented at trial. See *Casco*, 283 Kan. at 515 (factfinder must regard undisputed evidence which is not improbable, unreasonable, or untrustworthy as conclusive).

Hendrick argues that Eder's injury was due to a personal risk or as a result of Eder's normal day-to-day activities. Injuries which arise out of risks personal to an employee or an employee's normal day-to-day activities are not compensable. See K.S.A. 2012 Supp. 44-508(f)(3)(A). Some evidence was presented at the hearing demonstrating that Eder's injuries may have arisen out of his home auto repair work. Eder did tell Dr. Tenny that his neck pain began after a weekend working on trucks. Both Dr. Koprivica and Dr. Pratt agreed that the temporal relationship between any work Eder may have done over the weekend and his injury suggested the work was a factor in the development of his neck pain. Eder himself, however, denied working at home over the weekend. Furthermore, no physician testified that Eder's home auto repair work was the primary factor causing his repetitive trauma. While there was some conflicting evidence at the hearing, it was not enough to undermine the substantial nature of the evidence which supports the Board's conclusion that Eder's repetitive trauma arose out of his employment and was thus compensable. See *Messner v. Continental Plastic Containers,* 48 Kan. App. 2d 731, 750, 289 P.3d 371 (2013) (appellate court only reviews conflicting evidence to determine whether it has so undermined evidence supporting Board's decision as to call into question its substantial nature). We affirm the Board's finding that Eder's June 2011 injury was compensable.

Next, Hendrick argues Eder failed to comply with the statutory requirements for proper notice regarding his June 2011 injury. Hendrick contends the Act required Eder to give Hendrick notice of his injury within 30 days of its occurrence. Furthermore, that notice was statutorily required to contain certain information. Because Eder did not notify Hendrick until approximately 9 months later that his injury was work related, it asserts Eder may not recover any award.

Whether an employee has provided timely notice of any injury is a question of fact. See *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 838, 233 P.3d 299 (2010). K.S.A. 2012 Supp. 44-520 provides the statutory requirements for proper notice under the Act. Under K.S.A. 2012 Supp. 44-520(a)(1):

> "Proceedings for compensation under the workers compensation act shall not be maintainable unless notice of injury by accident or repetitive trauma is given to the employer by the earliest of the following dates:
>
> "(A) 30 calendar days from the date of accident or the date of injury by repetitive trauma;
>
> "(B) if the employee is working for the employer against whom benefits are being sought and such employee seeks medical treatment for any injury by accident or repetitive trauma, 20 calendar days from the date such medical treatment is sought; or
>
> "(C) if the employee no longer works for the employer against whom benefits are being sought, 20 actual days after the employee's last day of actual work for the employer."

Notice to the employer of an employee's injury must include "the time, date, place, person injured and particulars of such injury." K.S.A. 2012 Supp. 44-520(a)(4). If, however, the employee demonstrates the employer had actual knowledge of the injury, the notice requirement is waived. K.S.A. 2012 Supp. 44-520(b).

14

To determine whether an employee gave timely notice of a repetitive injury, courts generally must first determine when the repetitive injury occurred. Under K.S.A. 2012 Supp. 44-508(e), the date of injury by repetitive trauma is the earliest of:

"(1) The date the employee, while employed for the employer against whom benefits are sought, is taken off work by a physician due to the diagnosed repetitive trauma;

"(2) the date the employee, while employed for the employer against whom benefits are sought, is placed on modified or restricted duty by a physician due to the diagnosed repetitive trauma;

"(3) the date the employee, while employed for the employer against whom benefits are sought, is advised by a physician that the condition is work-related; or

"(4) the last day worked, if the employee no longer works for the employer against whom benefits are sought."

The Board in this case did not make a finding as to when Eder's repetitive trauma injury occurred, and appellate courts generally do not make factual findings. See *Douglas v. Ad Astra Information Systems, L.L.C.*, 296 Kan. 552, 562, 293 P.3d 723 (2013) ("Appellate courts do not make factual findings but instead review those made by district courts or administrative agencies."). Without this finding, we cannot determine if Eder's notice complied with K.S.A. 2012 Supp. 44-520(a)(1).

Nevertheless, the Board did find that Hendrick had proper notice of Eder's June 2011 injury because it had actual knowledge of the injury. As noted above, the notice requirements of K.S.A. 2012 Supp. 44-520(a)(1) are waived if an employer has actual knowledge of an injury. K.S.A. 2012 Supp. 44-520(b). The Board pointed out that Eder called his supervisor Kelford and told him about his neck pain. He reported to Kelford that he was not sure what caused the pain, but he did not know what it could be other than his work for Hendrick. Kelford had Eder fill out an accident report, and Eder then went to Hendrick's workers compensation clinic. The doctor at the clinic determined Eder's injury was not work related. The Board reasoned Eder would not have filled out an accident

15

report and gone to a workers compensation clinic if no one suspected his injuries might be work-related. Furthermore, the doctor at the clinic would not have determined the injury was not work-related if no one was questioning the cause.

The Board has previously found that the filing of an accident report demonstrates actual knowledge of an injury. For example, in *Fornes v. Junction City Wire Harness*, No. 1,072,953, 2015 WL 3642466 (Kan. Work. Comp. App. Bd. 2015), the claimant alleged a repetitive trauma injury to her shoulder, but the respondent denied receiving proper notice of the injury. At the hearing, claimant's supervisor testified she completed an accident report 7 days after the injury, though the actual report was not in evidence. The Board found the respondent had actual knowledge of the injury because, "[i]f the respondent had no knowledge of an injury, as alleged, an accident report would not have been completed." 2015 WL 3642466, at *6. Because the respondent had actual knowledge of the claimant's injury, the Board found the notice requirements were waived. See also *Wendel v. Morton Buildings, Inc.*, No. 1,071,376, 2015 WL 3642463, at *4 (Kan. Work. Comp. App. Bd. 2015).

If an accident report may serve to demonstrate actual knowledge of an injury, then substantial evidence supports the Board's finding that Hendrick had actual knowledge. Eder testified that he told Kelford about his neck pain and that he did not know what could have caused it other than work. He also testified that he filled out an accident report and saw a doctor at Corporate Care. Hendrick did not contest any of these facts at the hearing nor does it contest these facts in its brief.

Furthermore, the facts of this case suggest Eder's actions served the purpose of the notice requirement. The generally recognized purpose of the notice requirement is to give the employer an opportunity to investigate the accident or injury and provide medical treatment. *Pike v. Gas Service Co.*, 223 Kan. 408, 409, 573 P.2d 1055 (1978). For example, in *Battah v. Hi-Lo Industries, Inc.*, No. 110,972, 2014 WL 7152361 (Kan. App.

16

2014) (unpublished opinion), the court upheld the Board's determination that the claimant had failed to provide timely notice of injury. In that case, the claimant began experiencing back pain at work and developed sudden pain in his hips and legs one day after moving particle board. He took time off work due to the pain and sought private medical treatment. The record did not indicate, however, that he had ever told his supervisors the injury might be work related until 8 weeks later when he asked about possible workers compensation. The *Battah* court noted that while respondent may have known the claimant was injured, the claimant's failure to notify respondent of a possible work connection prevented respondent from investigating the injury for 8 weeks. 2014 WL 7152361, at *5.

Unlike in *Battah*, the purpose of the notice statute was likely served in Eder's case. Eder reported the nature of his injury (neck pain) to his supervisor as well as the possibility it might be work related. Eder also filled out an accident report regarding his injury. This provided Hendrick with an opportunity to investigate the injury should Eder later make a workers compensation claim. Furthermore, Hendrick was clearly able to provide medical treatment, and it obtained the opinion of a medical professional as to whether Eder's injury was actually work-related.

Because Hendrick had actual knowledge of Eder's injury, the notice requirements of K.S.A. 2012 Supp. 44-520(a)(1) are waived. We affirm the Board's findings that Hendrick had proper notice of Eder's injury.

Hendrick further argues the Board erred in awarding temporary total disability to Eder because it was duplicative of other benefits Eder had received. It asserts Eder took paid time off and vacation and received short-term and long-term disability after his June 2011 injury. Hendrick contends awarding Eder temporary total disability benefits for this period would not serve the purpose of the Act and would grant Eder a windfall.

17

Resolution of this issue requires interpretation of the statutes regarding temporary total disability. We have unlimited review of issues concerning the interpretation or construction of a statute, owing no deference to the Board's interpretation or construction. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013); *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 193, 364 P.3d 571 (2014).

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Hoesli v. Triplett, Inc*., 303 Kan. 358, 362, 361 P.3d 504 (2015). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Hoesli*, 303 Kan. at 362.

Under K.S.A. 2012 Supp. 44-510c(b)(2)(A), an employee should receive temporary total disability when a compensable injury has rendered him or her "completely and temporarily incapable of engaging in any type of substantial and gainful employment." An employee should also receive temporary total disability when an authorized treating physician imposes restrictions as a result of a compensable injury that the employer cannot accommodate. K.S.A. 2012 Supp. 44-510c(b)(2)(B). Pursuant to K.S.A. 2012 Supp. 44-510c(b)(4), however, "[a]n employee shall not be entitled to receive total disability benefits for those weeks which the employee is also receiving unemployment benefits."

In *Pierson v. City of Topeka*, No. 113,247, 2016 WL 687726 (Kan. App. 2016) (unpublished opinion), the Board awarded temporary total disability to a claimant who was unable to work for several months due to a work-related injury. On appeal, the respondent argued the claimant was not statutorily entitled to temporary total disability

because he had used his sick leave and vacation time and received benefits under his short-term disability insurance during the period in which he could not work. The *Pierson* court disagreed with respondent and affirmed the award. 2016 WL 687726, at *5.

In reaching its conclusion, the *Pierson* court noted that K.S.A. 44-510c(b)(4) specifically prohibits employees from receiving temporary total disability while also receiving unemployment benefits. The court continued:

> "In crafting that subsection, the legislature provided a specific offset against temporary total disability benefits. But the legislature chose not to include offsets for other sources of payments that effectively substitute for wages. We think that provides a fairly unmistakable refutation of the City's argument. A common canon recognizes that the inclusion of one thing in a statute may be taken as indicating legislative intent to exclude like things not mentioned. *In re Marriage of Killman*, 264 Kan. 33, 42, 955 P.2d 1228 (1998); *Harwood v. Feyh*, No. 108,603, 2013 WL 5187637, at *4 (Kan. App. 2013) (unpublished opinion) (recognizing and applying canon to different section of Workers Compensation Act), *rev. denied* 299 Kan. 1269 (2014). The canon applies here." 2016 WL 687726, at *5.

Hendrick's argument similarly fails. Hendrick argues providing temporary total disability to Eder fails to serve the purpose of the Act and provides a windfall for Eder. Under the laws of statutory construction, however, there is no need to look past the language of a statute when the language is plain and unambiguous. Here, the legislature has clearly included an offset for unemployment benefits but has not included offsets for other payments such as paid vacation or short-term disability. Furthermore, as noted in *Pierson*, the inclusion of unemployment benefits implies that the legislature has excluded other similar things not mentioned. See also *Cole v. Mayans*, 276 Kan. 866, 878, 80 P.3d 384 (2003) ("*expressio unius est exclusio alterius*, *i.e.*, the inclusion of one thing implies the exclusion of another"). Because there is no statutory basis to deny Eder temporary total disability, the Board did not err, and we affirm the award.

19

Hendrick also argues that Eder may not recover permanent partial general disability benefits because he voluntarily resigned from his position at Hendrick. It contends it already demonstrated it was able and willing to accommodate any restrictions a medical professional might impose on Eder's work. Eder, however, resigned his position based solely on his subjective complaint that he was in too much pain to continue working at Hendrick. Hendrick asserts without a medical restriction, Eder's resignation was voluntary, and any resultant wage loss may not be used in determining permanent partial general disability.

The Board's factual findings are reviewed for substantial evidence. K.S.A 2015 Supp. 77-621(c)(7); *Williams*, 299 Kan. at 795. To the extent this issue requires statutory interpretation, this court applies a de novo standard of review. *Fernandez*, 296 Kan. at 475; *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 193, 364 P.3d 571 (2014).

Calculating an employee's permanent partial general disability requires the calculation of any wage loss on the part of the employee. See K.S.A. 2012 Supp. 44-510e(a)(2)(B). Wage loss is "the difference between the average weekly wage the employee was earning at the time of the injury and the average weekly wage the employee is capable of earning after the injury." K.S.A 2012 Supp. 44-510e(a)(2)(E). Under K.S.A. 44-510(a)(2)(E)(i), "[w]age loss caused by voluntary resignation or termination for cause shall in no way be constructed to be caused by the injury."

Even though Eder left his job at Hendrick for a position at Zurich, the Board found that Eder did not "voluntarily resign." The Board noted that Eder was unable to physically perform his job at Hendrick, and even though he was not required to ask for a job modification, he did discuss alternative positions with Hendrick. The Board also did not find Eder's lack of restriction following his second injury to be realistic and noted that of the three testifying physicians, only Dr. Bailey concluded that Eder had no continuing

20

work restrictions. It further noted that Eder testified his pain forced him to seek other, more suitable employment, and the Board found this could not be characterized as "voluntary."

Substantial evidence supported the Board's finding that Eder did not voluntarily resign. Eder testified that he was released to work after his second surgery with some restrictions on September 20, 2012. Despite work accommodations, he continued to have chronic neck pain and headaches during this period, and he sought treatment for pain management. Dr. Bailey released Eder to work without restrictions on January 2, 2012, but Eder testified he continued to have neck pain and he eventually had to resign due to the pain. Moreover, Eder continued to have significant neck pain even once he took a sedentary position at Zurich.

Additionally, Dr. Bailey released Eder to work without restrictions on January 6, 2013. As the Board notes, however, two out of the three physicians who testified at trial concluded Eder's second injury necessitated continuing work restrictions. According to Dr. Koprivica, Eder needed permanent restrictions after his second surgery. Dr. Pratt also opined Eder should permanently avoid awkward positions or forceful activities like torqueing. Furthermore, Eder's testimony suggests he would have continued to have significant pain even if an accommodated position were available at Hendrick.

Hendrick argues that Eder's subjective determination that he could not continue working at Hendrick due to his neck pain is insufficient to demonstrate his resignation was not voluntary. A recent unpublished Kansas Court of Appeals case sheds some light on this issue. In *Locke v. Barnds Bros., Inc.*, No. 112,029, 2015 WL 2137207 (Kan. App. 2015) (unpublished opinion), the claimant challenged the Board's majority opinion that he had failed to establish a qualifying wage loss. The claimant left his job at respondent due to chronic pain, despite the fact that respondent offered him an accommodated

21

position. In reaching its decision that the claimant did not have a qualifying wage loss, the Board did not appear to have considered his chronic pain.

On review, the *Locke* court found the Board had erred in determining the claimant's task loss. 2015 WL 2137207, at *5. In determining a wage loss under K.S.A. 2012 Supp. 44-510e(a)(2)(E), the Board must consider all factors, including an employee's physical capabilities. As the court noted, "[a] worker's inability to perform particular tasks or to remain on duty for a set number of hours because of pain caused by a compensable injury is a factor bearing on physical capability." 2015 WL 2137207, at *5. The court found the Board's task loss determination was erroneous because it had not considered the claimant's chronic pain in reaching its conclusion. 2015 WL 2137207, at *5.

The *Locke* opinion dealt with a different issue than the one before us. *Locke* does stand for the proposition, however, that chronic pain is relevant to an employee's physical capability to perform a job. If an employee cannot perform a job due to chronic pain, then that employee may be physically incapable of performing the job. If an employee quits a job because he or she is physically incapable of performing that job, then his or her resignation is arguably not voluntary. See Black's Law Dictionary 1806 (10th ed. 2014) (defining "voluntary" as "[d]one by design or intention"); see also *Joshua W. Langkiet v. Layne Christensen Co.*, No. 1,059,778, 2016 WL 3669847 (Kan. Work. Comp. Bd. 2016) (finding claimant did not voluntarily resign by leaving work due to significant back pain); *Andrea D. Culwell v. Evans Bierly Hutchison & Associates*, No. 1,063,390, 2014 WL 4402467 (Kan. Work. Comp. App. Bd. 2014) (finding claimant voluntarily resigned because respondent offered her a suitable accommodated position).

Hendrick also argues that "[a]bsent a medically substantiated restriction, the statute is unequivocal that 'wage loss caused by voluntary resignation . . . shall in no way be construed to be caused by the injury.'" The plain language of K.S.A. 2012 Supp. 44-

510e(a)(2)(E)(i) does not require "medically substantiated restrictions" before a finding that an employee's resignation was not voluntary. A later subsection, K.S.A. 2012 Supp. 44-510e(a)(2)(E)(iii), regarding a rebuttable presumption of no wage loss mentions medical restrictions. Neither the ALJ nor the Board applied this subsection. Hendrick does not mention this subsection in his argument nor does it appear to be factually applicable in this case. See also *Locke*, 2015 WL 2137207, at *6 (finding subsection inapplicable in case where no authorized treating physician had imposed work restrictions).

Hendrick next argues there was not sufficient evidence to support the Board's finding that Eder suffered a 56% task loss due solely to his March 2012 injury. It contends that while the Board may adjust medical testimony, there must still be substantial evidence supporting it. Hendrick asserts there was no substantial evidence to support the Board's adjustment of Dr. Pratt's testimony to establish a 56% task loss.

K.S.A. 2012 Supp. 44-510e(a)(2)(D) defines task loss as "the percentage to which the employee, in the opinion of a licensed physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the five-year period preceding the injury." In determining an employee's task loss,

> "[t]he permanent restrictions imposed by a licensed physician as a result of the work injury shall be used to determine those work tasks which the employee has lost the ability to perform. If the employee has preexisting permanent restrictions, any work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed prior to the injury at issue, shall be excluded for the purposes of calculating the task loss which is directly attributable to the current injury." K.S.A. 2012 Supp. 44-510e(a)(2)(D)

In determining task loss, the Board, as the factfinder, "has the right and the obligation to weigh the evidence and determine the credibility of witnesses, including the

23

physicians who testified, and utilize that as a factor in making its decisions." *Tovar v. IBP, Inc.*, 15 Kan. App. 2d 782, 785, 817 P.2d 212 (1991)*s*. Because the Board must often determine task loss based on conflicting evidence, it may "decide which testimony is more accurate and/or credible, and . . . adjust the medical testimony along with the testimony of the claimant and any other testimony which may be relevant to the question of disability." 15 Kan. App. 2d at 786. The Board's ultimate task loss opinion, however, must still be supported by substantial evidence. See 15 Kan. App. 2d at 786 (finding substantial evidence supported adjusted medical testimony).

In *Tovar*, the district court made a finding as to the claimant's impairment and disability that differed from the testimony of all four witnesses at the hearing. Two physicians testified the claimant had a 2 percent impairment in both of his hands. A third physician testified the claimant had a 15% impairment in both of his hands. The claimant himself also testified regarding what he believed his disabilities to be. The district court concluded the claimant had a 9 percent impairment in both hands. On appeal, the *Tovar* court affirmed the district court's finding because it was supported by substantial evidence. 15 Kan. App. 2d at 785-86.

Kansas courts have upheld Board decisions disregarding uncontested medical testimony due to factual circumstances that undermined its validity. See *Miller v. Williams Mach. Tool Co.*, No. 97,803, 2008 WL 762518, at *6-7 (Kan. App. 2008) (unpublished opinion). Kansas courts have also upheld decisions which have essentially averaged medical testimony regarding a claimant's impairment. See *Tovar*, 15 Kan. App. 2d at 785-86. There do not appear to be any cases in which Kansas courts have addressed the Board's factual finding adjusting the medical testimony of a single witness based only on that same witness' own testimony.

In this case, the Board adjusted the medical testimony presented at the hearing without the support of substantial evidence. The Board found Dr. Koprivica's testimony

24

regarding Eder's task loss to be noncredible and disregarded it. The Board then noted it found Dr. Pratt's testimony was also inconsistent. Dr. Pratt testified Eder had a 56% task loss as a result of both of his injuries but 0% task loss as a result of solely his March 2012 injury. The Board noted Dr. Pratt also indicated he would have imposed certain lifting as well as pushing and pulling restrictions after his first injury and fusion, and he would have imposed similar restrictions after his second fusion. The Board concluded restrictions are as appropriate after a two-level fusion as a one-level fusion, thus Dr. Pratt's 56% task loss opinion more accurately reflects Eder's task loss after his two-level fusion.

While the Board may adjust medical testimony to best assess a disability, the adjustment must still be supported by substantial evidence. In this case, substantial evidence does not support the Board's determination. Dr. Koprivica was the only physician who testified Eder had any task loss due solely to his second injury, but the Board disregarded his testimony due to its credibility determination. Dr. Pratt concluded Eder suffered a 56% task loss due to both of his injuries combined, but he specifically opined Eder had 0% task loss due solely to his second injury and two-level fusion. The Board chose to assign his 56% task loss opinion solely to his second injury and fusion. The only evidence the Board cited for adjusting Dr. Pratt's testimony in this manner was that Dr. Pratt testified he likely would have put Eder on restrictions requiring light and medium work after his first injury, and he also would have given Eder work restrictions after his second injury and fusion. The Board does not cite to any other evidence supporting its determination that Eder had a 56% task loss due solely to his March 2012 injury.

Furthermore, even if the Board did not err in initially adjusting Dr. Pratt's testimony in this way, the Board should have excluded any preexisting permanent restrictions from the 56% task loss. See K.S.A. 2012 Supp. 44-510e(a)(2)(D). In its reasoning on its task loss finding, the Board noted Dr. Pratt would have given Eder

25

restrictions after his first injury. The Board, however, assigned the entire 56% task loss to Eder's March 2012 injury without excluding these prior restrictions. Since the Board noted Eder had preexisting restrictions, it should have excluded those restrictions from the task loss for Eder's second injury. Based on these errors in determining Eder's task loss, we remand this issue to the Board for reconsideration.

Finally, Hendrick argues the Board erred in not reducing Eder's permanent partial disability by his preexisting disability. K.S.A. 2012 Supp. 44-501(e) provides: "An award of compensation for permanent partial impairment, work disability, or permanent total disability shall be reduced by the amount of functional impairment determined to be preexisting." The Board entered an award for Eder for his June 2011 injury claim, reversing the ALJ's ruling that the injury was not compensable. The Board also found Eder sustained a 15% whole person functional impairment due to his 2011 repetitive trauma injury. In calculating the award of compensation due to the March 2012 injury, the Board did not reduce Eder's award by the amount of his preexisting functional impairment due to his June 2011 injury. The Board noted neither party had argued the award should be reduced. Citing to *Goss v. Century Mfg., Inc.*, No. 108,367, 2013 WL 3867840 (Kan. App. 2013) (unpublished opinion), it stated it should not unilaterally raise the issue without a request from either party.

In a dissent, Board member Carpinelli stated: "While the parties did not raise the issue of whether respondent gets a credit in the second claim for claimant's preexisting impairment from the first claim, the majority opinion does not apply the law as written." He noted the Board should have reduced Eder's award for his March 2012 injury by his 15% preexisting impairment and doing so was simply part of properly calculating his award.

While *Goss* does hold that the Board should not raise issues *sua sponte*, that holding does not appear to be controlling in this case. In *Goss*, the ALJ twice granted the

26

respondent an extension of the deadline to submit evidence over the claimant's objection. The claimant later appealed the ALJ's award to the Board, but he did not assert the ALJ erred in granting the extensions or in admitting the respondent's evidence during the extensions. The Board *sua sponte* addressed the issue of the extensions and found that the ALJ erred in granting them and excluded any evidence admitted during those periods. On review, the *Goss* court found the Board's decision to exclude evidence was arbitrary and remanded the case for reconsideration. In reaching this conclusion, the court noted "the Board reached out to grab the matter of the continuances of the deadlines from the record . . . without a request from [the claimant] that it consider them," and this was a "curious overreaching" on the part of the Board. 2013 WL 3867840, at *4.

The present case and *Goss* are factually distinguishable. In *Goss*, the Board overreached because it addressed errors made by the ALJ *sua sponte*. In this case, the Board is not declining to address an error made on the part of the ALJ because neither party raised the issue. Rather, the Board is simply declining to apply K.S.A. 2012 Supp. 44-501(e) as written because neither party specifically requested the Board do so.

Additionally, there was no issue Hendrick could have raised. The ALJ determined Eder's June 2011 injury was noncompensable. When the ALJ calculated Eder's permanent partial disability, it did not deduct any preexisting impairment because there was none. Hendrick could not have argued the ALJ erroneously applied K.S.A. 2012 Supp. 44-501(e) because the ALJ had no need to apply the statute.

Because the plain language of K.S.A. 2012 Supp. 44-501(e) requires the Board to reduce permanent partial disability by the amount of preexisting impairment, the Board erred in not doing so. There was no need for Hendrick to raise this issue because it is simply a matter of applying the statute as written. We remand this issue to the Board for reconsideration.

27

Substantial evidence supported the Board's finding that Eder's June 2011 injury was compensable. Because Hendrick had actual knowledge of Eder's June 2011 injury, he is not precluded from claiming compensation for this injury due to lack of notice. The Board's award of temporary total disability was not duplicative of other benefits Eder received after June 2011 as the Act only provides for an offset for unemployment benefits. Eder did not voluntarily resign from his position after his second injury because he was physically incapable of performing the job due to chronic pain. Therefore, he may still claim permanent partial general disability. We affirm the Board on the above issues.

Substantial competent evidence did not support the Board's finding regarding task loss. Additionally, the Board should have reduced Eder's permanent partial disability by the amount of his preexisting disability. These issues are remanded for reconsideration.

Affirmed in part and remanded.